

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,580

---

### ALBERT JAMES TURNER, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. 10-DCR-054233
### IN THE 268TH DISTRICT COURT
### FORT BEND COUNTY

---

PRICE, J., delivered the opinion of the Court in which WOMACK, JOHNSON, COCHRAN, and ALCALA, JJ., joined. KELLER, P.J., filed a dissenting opinion in which MEYERS, KEASLER, and HERVEY, JJ., joined.

### O P I N I O N

The appellant was convicted of the intentional murder of more than one person during the same criminal transaction, namely, his wife and his mother-in-law, which is a capital offense.[1] The jury answered the statutory special issues in such a way that the trial court was

---

[1] TEX. PENAL CODE § 19.03(a)(7)(A).

required to assess the death penalty.[2] Direct appeal is automatic in this Court.[3]

The appellant does not challenge the sufficiency of the evidence to support either his conviction or death sentence. In fourteen of his twenty-four points of error, he claims that he was incompetent to stand trial, or that the trial court should at least have paused the proceedings at various stages of trial to conduct a formal competency hearing, as his trial counsel repeatedly requested.[4] In order to address these various points of error adequately, we must undertake a detailed recitation of certain events transpiring before and during trial.

## COMPETENCY TO STAND TRIAL

The evidence at trial showed that, just after midnight on December 27, 2009, the appellant entered the home of his in-laws and killed his wife, Keitha Turner, and his mother-in-law, Betty Jo Frank, cutting their throats while his three young children were present in the house.[5] Although we find no indictment in the clerk's record, the docket sheet indicates that on March 3, 2010, Ralph Gonzalez was appointed to represent the appellant, that a grand jury indicted the appellant for capital murder on April 5, 2010, and that, on May 17, 2010,

---

[2] TEX. CODE CRIM. PROC. art. 37.071, §§ 2(b) & 2(e)(1).

[3] TEX. CODE CRIM. PROC. art. 37.071, § 2(h).

[4] In his ninth point of error, the appellant specifically argues that we should remand the cause for a retrospective competency hearing. Appellant's Brief at 29-31.

[5] There is no evidence that the home was broken into, and the appellant was not charged with committing murder in the course of a burglary, another theory of capital murder. TEX. PENAL CODE § 19.03(a)(2).

Gonzalez filed a motion to have the appellant evaluated for his competency to stand trial. The trial court immediately granted that motion, and the appellant was promptly evaluated by two forensic mental-health experts: psychologist Dr. Karen Gollaher and psychiatrist Dr. David Axelrad.

## I. The Facts

## A. The Initial Competency Reports

Dr. Gollaher conducted the first evaluation on May 18th and 19th, 2010. In her report, Gollaher notes that the appellant "reported the belief that his wife had been having an affair for many years with the Mayor of Kendleton, Texas[,]" but that "she had repeatedly denied any extramarital relationship, calling him paranoid." Gollaher also noted that the appellant's recent jail records "appear to refer to possible delusional thinking[.]" While the appellant denied any such delusional thinking during the evaluation, Gollaher nevertheless noted "several statements" that he made to her "that raise[d] the possibility of paranoid thinking." Moreover, "he reported the jail psychiatrist prescribed him Risperdal but he has not taken his medications because he does not believe he needs it."[6] Gollaher did not diagnose the appellant as suffering from any particular thought disorder. She did not believe his possible paranoid thoughts would "undermine his ability to participate in the court procedures." She also concluded that the appellant was "capable of communicating events in an

---

[6] According to the 2010 edition of the Physicians' Desk Reference, Risperdal is an "atypical antipsychotic" prescribed for the treatment of schizophrenia and bipolar disorder. PHYSICIANS' DESK REFERENCE 2682 (64th ed. 2010).

understandable manner and can report his state of mind." It was her ultimate professional opinion that the appellant was, as of that time, competent to stand trial.

Dr. Axelrad evaluated the appellant a month later, on June 14, 2010, also ultimately concluding that he was competent to stand trial. In his report,[7] however, Axelrad acknowledged that the appellant "is an individual who may have a mental illness and the diagnosis may be a paranoid disorder." Although he did not note any impairment in the appellant's thought process or content, he nevertheless found the appellant to be "mildly impaired" in his abilities: 1) to disclose to counsel pertinent facts, events, and states of mind; 2) to engage in a reasoned choice of legal strategies and options; and 3) to engage with counsel. From the recent jail records, Axelrad noted that the attending psychiatrist had found the appellant to be "exhibiting some paranoid ideation, and he does appear to be delusional." The appellant also exhibited "some paranoid ideas" and "mild paranoid functioning" during Axelrad's evaluation. The appellant reported to Axelrad that he had "lost confidence in his attorney, and [he did] appear to have significant problems in his relationship with his current attorney, Mr. Gonzalez." The appellant would not discuss the circumstances of the offense with Axelrad; consequently, Axelrad was "unable to address, at this time, as to whether [the appellant] had a paranoid disorder. In the event he has a paranoid disorder, this may be

---

[7] Axelrad's report was submitted on the form approved by the Texas Correctional Office on Offenders with Medical or Mental Impairments under Section 614.0032(b) of the Texas Health and Safety Code. TEX. CODE CRIM. PROC. art. 46B.025(d); TEX. HEALTH & SAFETY CODE § 614.0032(b).

contributing to the problems he is experiencing with his attorney." With this caveat, Axelrad concluded that the appellant was nonetheless competent to stand trial—and even that he was competent "to enter into plea negotiations concerning his alleged offense in the event that he and his attorney can develop an effective working relationship."

### B. Pretrial Proceedings

The first pretrial hearing on record was an *ex parte* conference that took place in chambers on June 23, 2010. By this time the trial court had appointed a second attorney, Pat McCann. Gonzalez reported to the trial court that, while he had not yet seen the experts' competency reports, he had been told that Gollaher deemed the appellant competent to stand trial and that Axelrad had found him to be "perfectly fit." Even so, Gonzalez informed the trial court that "[w]e're having difficulty with [the appellant] accepting a lot of things that happened. And one of the biggest things is his family, his children. There is a little bit of disconnect right now." Nevertheless, the appellant's counsel did not request any further proceedings at this time with respect to his competency to stand trial.

More than four months later, on November 9, 2010, counsel for the appellant filed a notice of intent to take the depositions of two of the appellant's children. On November 22, 2010, in open court, at the beginning of a hearing on pretrial motions, the appellant personally informed the trial court that he had filed a grievance against his lawyers and wanted a new "defense team" appointed. He complained that he did not wish to have his children deposed and that his lawyers had not explained to him the purpose behind the

various pretrial motions on file. Defense counsel denied that they had failed to explain the motions and asserted that they needed to depose the children to obtain discovery and for other undisclosed purposes in the service of their client's best interests. The trial court denied the appellant's request for new lawyers.

Another *ex parte* conference occurred in chambers on December 10, 2010,[8] the same day that the deposition of the appellant's children was originally scheduled. The appellant's counsel revealed that the relationship between the appellant and Gonzalez had deteriorated to the point that the appellant had physically threatened Gonzalez. Gonzalez related:

> In my thirty years, I've been threatened on several occasions but never as adamantly and never [as] menacingly as this guy. I believe that no matter what I tell him, if I could tell him that he would be getting out of jail tomorrow and nothing would happen to him, he would not believe me. There is nothing that I can do to convince that man that I have anything of benefit to do for him or that I can do for him.

Because the attorney/client relationship had become so "untenable," Gonzalez filed a motion to withdraw. That same day, in open court, the appellant personally reiterated that he was "opposed to the depositions" of his children and did not "want Mr. Gonzalez on my case." The trial court granted Gonzalez's motion to withdraw. Because Gonzalez had been the member of the defense team who had prepared to conduct the depositions, they were rescheduled. On December 14, 2010, the trial court appointed Tyrone Moncriffe to replace

---

[8] Because the presiding judge for the 268th Judicial District Court was out sick on December 10, 2010, both this *ex parte* conference in chambers and the hearing that occurred in open court later that same day were presided over by the judge of the 434th Judicial District Court.

Gonzalez and, on January 5, 2011, the trial court granted the defense a trial continuance until April 18, 2011, with final pretrial motions to be heard on April 11, 2011, in order to give Moncriffe sufficient time to familiarize himself with the case.

The April 11th hearing began with a renewal of the appellant's efforts to replace his trial counsel. The trial court had received "letters" by fax from a woman purporting to be the appellant's sister that asked the trial court to "fire[]" the appellant's trial counsel. Because the faxed copies of the letters did not bear his signature, however, the appellant refused to "endorse" them as his. The trial court therefore declined to "take them up[.]" McCann told the trial court that "we are doing everything possible to prepare for this trial; but [the appellant] has not agreed to speak with us on many occasions[.]"

Later during the same pretrial hearing, the trial court returned to the issue of the appellant's displeasure with his trial counsel, directly asking the appellant whether he wished to represent himself. The appellant unequivocally responded, "No." He complained, however, that trial counsel "have not shown me any evidence." He acknowledged that they had played for him a recording of the 911 call in which his daughter had reported the murders, but he complained that he had not been able to hear it. McCann answered that the appellant had been provided everything except for the actual physical evidence, including offense and autopsy reports, and that, not only had the appellant been able to hear the 911 recording, it had made him weep. McCann agreed to make all the evidence available for the appellant again. The appellant then complained that his lawyers had not contacted the Mayor

of Kendleton or conducted any paternity testing to determine whether the Mayor was the real father of the appellant's youngest child. McCann explained that they had in fact interviewed the Mayor but that the result of any paternity testing was, in any event, "sadly not legally relevant." The trial court informed the appellant that it would not remove trial counsel from the case and suggested that he "start cooperating with them."

Later that same day, another *ex parte* conference took place in chambers. McCann informed the trial court that "we're going to attempt to go speak with him; but at some point, based upon his clear paranoia that somehow I and the rest of the Defense team are working with the State to ensure his conviction, we may need to revisit competency at some point with you." The trial court responded that "we can do a competency exam while we are doing the voir dire."

## C. Voir Dire

Voir dire was set to commence the next week, on April 18, 2011. In the interim, McCann filed a "Motion for a Contested Competency Hearing." Attached to this motion were an affidavit from Moncriffe, dated April 7, 2011, and a competency evaluation from a neuropsychologist, Dr. Shawanda Williams-Anderson, dated April 12, 2011. Moncriffe explained that it was part of the defensive strategy to depose the appellant's children and then agree for the State to use the deposition testimony in lieu of live testimony at trial, since, in their estimation, "the impact of [the appellant's] children describing their mother and grandmother's horrible [deaths] was much more damaging live than by deposition."

Accordingly, McCann had conducted the depositions on April 1, 2011, while Moncriffe and the appellant watched by video link from an adjoining room. The appellant watched with "a bewildered look on his face." Afterwards, he yelled at his lawyers, accusing them of making his children testify against him, in conspiracy with the District Attorney. "He cannot assist his defense team," Moncriffe concluded, "nor does he have a rational understanding of the magnitude of these proceedings. He seems to have one train of thought and he disregards all other rational thoughts completely." Dr. Williams-Anderson evaluated the appellant on April 12, 2011. She concluded that, "[b]ecause of the seriousness of [the appellant's] charges, his unwillingness to participate in his defense, and his extreme distrust of every member of his team, his competency to stand trial is questionable."

At a hearing on the motion for a formal competency hearing, which convened on April 18th, the first day of voir dire, McCann argued that the appellant's "paranoia has grown to the level of delusions[.]" "It's become an issue to the point where [the appellant] actively appears to believe that we are working against his own interests, and the delusion seems complete and full-blown." McCann explained that the appellant's

> attitude has gotten worse in the last several weeks, that we have spent numerous hours with [him] over the last several days since the hearing on the 11th; and we have all come to the conclusion that at this point he is -- although he interacts with us on this plane of reality, he frankly is thinking and living in another one that does not appear to comport with either the evidence we've shown him, our views of the case, or anything that we can determine as a group as rational.

Responding to the prosecutor's argument that simple disagreement between a lawyer and his

client does not raise an issue of competency, and the trial court's request that McCann "focus on the fact that we've already conducted the competency evaluation in this case[,]" McCann asserted:

> I have defended serial killers and people who have killed their whole families, and this case is challenging even my ability to . . . see how this could not be originating from anything but mental illness. * * * It has now gotten to a place . . . where [the appellant's] version of the reality of the facts that he deals with day-to-day, whatever evidence is shown, whatever discussions we have, comes from a place of such deep rooted paranoia that I can no longer believe it is simply a difficult person that I'm dealing with.

Given the competency evaluations that had already been conducted by Drs. Gollaher and Axelrad, the trial court found that what Dr. Williams-Anderson characterized as the appellant's simple "unwillingness to participate in his defense" provided insufficient grounds to conduct a competency hearing, and it therefore denied the motion.

McCann broached the subject of competency again about a week into voir dire when, on April 26, 2011, he complained that, "although I have attempted to engage with my client in regards to his opinions, for whatever reason, it appears to have been shut down." He urged the trial court take up his motion for a competency hearing again. The trial court advised him to file a new motion with accompanying affidavit. McCann apparently did,[9] because a renewed hearing was held on April 27, 2011. While persisting in its refusal to order a formal competency hearing, the trial court at this time decided "to direct the Court's behavioral mental health director to do an evaluation to determine whether [the appellant's] status has

---

[9] We find no such motion or affidavit, however, in the record.

changed since the last time a competency hearing occurred."[10] Afterwards, "I'll do an initial evaluation about whether [the appellant's] status has changed." Accordingly, the trial court ordered Dr. Connie Almeida, a licensed clinical psychologist and Director of the Fort Bend County Behavioral Health Services, to evaluate the appellant, with an emphasis on whether he was "able to rationally assist his lawyers in the defense of his case."

Dr. Almeida filed a report on May 19, 2011, and appeared at a hearing the next day, on May 20th. She testified that the appellant would not cooperate with her several attempts to evaluate him, and that the best she could do was to report her impressions from a half-hour conversation she had managed to have with him on May 17, 2011, during which "[h]e did express disagreement with some of the strategies and 'tactics' of his defense team." As of that date, the appellant was not taking any psychotropic medications, nor did the behavioral health staff at the jail deem such medications presently warranted. From all this, Almeida was unable to draw any conclusions about the appellant's competency to stand trial. But she believed there to be "no significant changes in his functioning" since he was initially evaluated for competency by Drs. Gollaher and Axelrad the previous summer. She could not say "definitively" that the appellant was not paranoid.

On cross-examination by the prosecutor, Almeida opined that, "based on my limited interaction with him, I would say that he would have a rational and factual understanding of

---

[10] Other than the informal hearing on April 18th, after which the trial court ruled that no formal competency hearing was necessary, there had been no prior competency hearing.

the proceedings against him."[11] She also acknowledged an observation she had made in her written report that "there is no current evidence to substantiate a delusional or other psychiatric disorder." Nor was she aware of "any behaviors that warrant a psychiatric intervention" since the appellant had been jailed. She nevertheless stood by her position that she was unable to reach a determination of her own whether the appellant had a present ability to assist his counsel, as the trial court had requested. The best she could say was that she perceived "no significant changes in [his] emotional or cognitive functioning since" the earlier evaluations that would adversely impact his competency to stand trial.

After hearing argument from the parties, the trial court denied the motion for a formal competency hearing. While acknowledging that Drs. Gollaher and Axelrad had made "notation of paranoia" in their initial competency reports, the trial court observed that they had not found the appellant's paranoia to be "sufficient to meet the statutory guidelines" for incompetency. The trial court opined that the appellant's evidence of incompetence, measured against those "statutory guidelines," "does not call for secondary competency evaluations unless there's a clear change in [the appellant's] whole aspect that raises a clear concern." The only such change that the trial court could see was the appellant's "failure to cooperate with [counsel] and that's his choice to make[.]" Even so, the trial court believed

---

[11] We note here that having a rational understanding of the proceedings is not the same thing as having the ability to consult with trial counsel with a reasonable degree of rational understanding or to "rationally assist his lawyers in the defense of his case"—the specific issue that the trial court asked Almeida to evaluate. Unless a criminal defendant satisfies both criteria, he is incompetent to stand trial. TEX. CODE CRIM. PROC. art. 46B.003(a).

this had been enough to justify appointing Almeida, in an abundance of caution, "to explore this area to see if there was such a change that it would require a full competency hearing." Although Almeida was unable to reach a conclusion whether the appellant's failure to cooperate with his counsel rendered him incompetent, the trial court reasoned, her inability was itself the product of the appellant's choice not to talk to her about his case. "That is a reasoned decision on his part. Does it reach to the level of incompetency, there's nothing to show today that it does that."

### D. Trial on the Merits

Trial on the merits began on May 25, 2011. During opening statements, McCann informed the jury that the defense expected the evidence to show that the appellant killed his wife in a "jealous rage," but that the killing of his mother-in-law, with whom the appellant had always gotten along, occurring in the close quarters of the upstairs hallway, had not been perpetrated intentionally—that the appellant, while certainly guilty of "two terrible horrible crimes[,]" was not guilty of a capital offense. Along the way, McCann explained to the jury that the appellant "doesn't like me very much." Later, he observed: "And if you look at him there, he's a large man, as he sits there scowling at me. Because he can't admit what he did, to himself or anybody else." The ensuing defensive strategy was to acknowledge that the State's evidence showing that the appellant was responsible for the two murders was at least substantial, if not overwhelming, but to try to engender a reasonable doubt in the jurors' minds whether he harbored the requisite culpable intent with respect to the death of his

mother-in-law to satisfy the statutory criteria for a capital offense.

On May 27th, the Friday before Memorial Day, the appellant exercised his right to testify in his own behalf, against the advice of counsel. After having the appellant identify photographs of his children, wife, and mother-in-law, McCann simply asked him whether there was "something you would like to tell this jury[.]" The prosecutor objected that the question called for a narrative response. Instructed to narrow his inquiry, McCann asked the appellant whether he had something to tell the jury about the night of the murders. After some additional wrangling, the appellant was allowed to describe in narrative fashion what he had done during the day of December 26, 2009, before the murders. As his narrative approached the time of the murders, however, the trial court directed McCann to ask another question. At a bench conference, McCann explained that he was ethically constrained from asking more specific questions, and the prosecutor speculated that McCann "can't do it because he knows it's a lie."[12] McCann was then allowed to ask the appellant whether he had

---

[12]

Trial counsel later renewed their claim that the appellant was incompetent in a motion for new trial. At a hearing on that motion, McCann testified that, prior to trial, the appellant "gave, at one point, three different versions of what had happened the night of the killings to myself and Mr. Moncriffe, and at no point in the conversation, did he indicate which one he intended to testify to." McCann continued:

> He became extremely upset with us and me, in particular, and began to ask if, you know, I was part of a secret society that was trying to get him killed or that was advancing my career by failing to defend him. He, at one point, when we were sitting next to each other, asked me if I was putting things in his coffee. It -- it had got to the point of absurdity in some of our conversations. He constantly referred me to Biblical passages that appeared to have no relevance in terms of his defense.

* * *

"something else [he] wanted to add[.]" At that point, the appellant vehemently denied having ever "put [his] hands on [his] wife[,]" and claimed that his daughter had said as much during a portion of her deposition testimony "that y'all recorded over." When the prosecutor's hearsay objection was sustained, McCann asked the appellant to describe the events *after* December 27th, and the appellant was once again allowed to narrate. He was not specifically asked on direct examination about the killings themselves.

On cross-examination, the appellant denied having threatened his first attorney, Gonzalez. He claimed that Gonzalez withdrew from the case because the appellant had tried to put a stop to the depositions of his children. The appellant further maintained that his children were coerced into giving the deposition testimony against him. At this juncture, McCann renewed his motion for a competency examination, but the trial court denied it, observing that "[t]here's nothing that I have been shown that changes anything that I have been shown before." The appellant next denied that his attorneys were "trying to save [his] life[.]" When the prosecutor asked the appellant whether McCann had been misleading the jury panel during his opening statement, the following transpired:

[The appellant] was obsessed with the Mayor of Kendleton with whom he believed his wife had had an affair. He was constantly attempting to blame the killings on this -- that person, and that's essentially what he testified to, almost as if he wanted it to be true. And I don't -- I'm not a mental health professional. I can only tell you that I have done this for many years. I have never had a client who, so fundamentally refused to acknowledge the daily reality that we were dealing with to the point that it was as if he was telling you the sky was always green. That -- I have to attribute to something other than . . . a simple attempt to lie because there was no basis for the lie. There was not a fact to support his view of what was going on.

A I asked him, before he made his statement, what -- what I was curious about what exactly was he going to make in his opening statement. And the reason I said that -- the reason I asked that question is because that we weren't talking. They weren't coming to see me. They didn't want to hear anything I had to say about the things that I was saying about the mayor and all the allegations that I was saying. They wouldn't investigate it. They kept bringing me -- I have proof of everything that I'm saying.

Q Do you know they talked to the mayor?

A That's what they told me.

Q I know. Everybody did.

A And I've, you know -- I looked at the thing. He was obviously lying.

Q Do you know these two gentlemen have tracked everything you have ever said down?

A No.

Q And it comes to one conclusion: You killed those two women.

A I didn't kill anyone.

Q And they're trying to save your life. You understand that?

A I didn't kill anyone.

The appellant further testified that his daughter had made a mistake to identify him as the killer. He explained that he fled the state after the killings because the Mayor had threatened him and had sent two unidentified men to break into his house. Asked whether his lawyers were part of this apparent "conspiracy" against him, the appellant replied that they were not "going out and getting the evidence that I was talking about, and I was wondering why." The prosecutor wrapped up his cross-examination of the appellant by asking him:

Q  All right.  Let me ask you this way: Is there any way, Mr. Turner, you want to change any of your story right now and beg for forgiveness from this jury at all?

A  I didn't kill anyone.

Q  I know.  Do you know how dangerous that makes you?

McCann's objection was sustained, but his motion for mistrial was denied.  On redirect, McCann simply asked:

Q  Mr. Turner, in your mind, all that drivel was true, wasn't it?

A  It is true.

Shortly after, the defense rested and both sides closed.

On Tuesday, May 31st, the morning that final arguments for the guilt phase were set to begin, the appellant unequivocally announced that he was "firing my defense team and representing myself.  I should be able to represent myself at any stage of this trial.  I have that right."[13]  When the trial court asked why, the appellant asserted:

They have seriously neglected my case.  They have ignored the information I have provided them for my defense.  Witnesses for my defense haven't been contacted that I've given them.

He made up -- he came up with an opening statement when I had – signed an affidavit or even told him that I -- that I killed anyone.  So where did he get this opening statement from, that it's an accident?  He has not defended me.

---

[13]

 In three points of error, the appellant argues that, if he was indeed competent, then he was denied his Sixth Amendment right to represent himself under *Faretta v. California*, 422 U.S. 806 (1975).  In view of our disposition of this appeal, we need not presently address this claim.

McCann reminded the trial court that he had recently renewed his request for a competency hearing based upon the appellant's paranoia. Directed to respond specifically to the appellant's complaints, McCann replied:

> We have, during the course of this investigation -- Without going into too much client confidence, Mr. Turner has indicated that there were entourage members of the mayor of Kendleton who might fit his description as well as other individuals whom he might have hired who was part of his hang-around crew. We have found no such individual who would refute the 100 percent-certain eyewitness identification of his own children during the incident.

> THE COURT: Mr. Turner testified that he was afraid of certain individuals and indicated that that was part of the reason why he fled. Did you pursue that investigation?

> MR. MCCANN: We have located no such individuals, either as a friend of the mayor of Kendleton nor any indication that the mayor of Kendleton was anywhere near his home on the night that he mentioned, nor that he has any proclivity or, indeed, any real relationship with his wife. That doesn't mean that Mr. Turner didn't think that there was one, but at the same time, we found no such indication.

> THE COURT: Mr. Turner has raised the issue that you have not pursued the theory that it was an accident. Would you respond to that allegation?

> MR. MCCANN: I understood him to mean that he rejected the theory that it was an accident because his testimony indicated he was not there. The only plausible defense that Mr. Moncriffe and I could see coming from the evidence that we examined is that the second killing -- while the first killing may have been an act of passion between a jealous husband and wife, the second killing would appear to have been unintended. At least there was no indication of any quarrel or violence between Mr. Turner and Betty Jo.

> And given the circumstances and the placement of the second floor, it is conceivable that he did not intend that killing and that killing was, in fact, either accidental or perhaps done in a reckless manner that would have indicated a lesser charge might be available or that we could argue plausibly

that that killing was not intentional.

Based upon these representations, the trial court summarily denied the appellant's demand to "fire" his trial counsel and represent himself. Closing arguments began soon after.

The prosecutors used their opening remarks to highlight the appellant's claim that his children had mistakenly identified him and to pound away at his failure to take responsibility.[14] For his part, McCann described the appellant's behavior this way:

---

[14] The jury heard a recording of the 911 call that the appellant's daughter placed to report the killings as they were occurring. The first prosecutor argued:

And I know that the only person not affected by that 9-1-1 call was the man who created it, the Defendant. And he basically told you that when he got up on that stand. He told that [his daughter] had misidentified him, that maybe she thought she saw him, but that's not who it was.

Misidentified him? This is a 12-year-old girl who's not identifying a stranger; she's not giving just a general description of someone. It's her father. She knows who he is, and she knows what he did.

\* \* \*

He chose to testify and tell you a story, and that's exactly what it was, a story. But it doesn't make sense because lies don't make sense.

The second prosecutor took up the theme of the appellant's demeanor from the witness stand:

There were no tears from the Defendant. And what you saw of him on Friday, there was no admissions by him of what he had done. There was no shame for what he had done. "I wasn't there."

And it was defiance. It was defiance with a complete lack of acceptance of what the facts are in his demeanor from the witness stand.

\* \* \*

He comes up with a story it's the mayor of Kendleton's fault. What does that tell you

> When I got up and talked to you in opening, I told you that my client, Albert James Turner, still hasn't accepted what happened because on that night, he snapped. You actually got to watch what he thinks is the truth because he literally cannot accept what happened. In his mind, very sadly, it is the truth.

He then went on to urge the jury nevertheless to accept the defensive theory that the appellant had not intended to kill his mother-in-law and, on that account, to find him not guilty of capital murder.

The State argued in response that the wound inflicted on the appellant's mother-in-law was too severe to justify a finding that it was not intentionally inflicted. Along the way, the prosecutor once again emphasized the absurdity of the appellant's testimony, reminding the jury that even McCann had characterized his story as "drivel." Later, during their closing arguments at the punishment phase of trial, the State similarly relied upon the appellant's implausible guilt-phase testimony to argue that the remorselessness he displayed in the courtroom and from the witness stand constituted compelling evidence that should convince the jury that he would constitute a future danger to society.[15]

---

about his demeanor and what his mindset is in this?

[15] Those arguments include the following:

> And then what does he do? He gets up on the stand and he tells you that he wasn't even there. With all the overwhelming evidence against him, he still can't admit that he did it. He gets up on the stand and he says, I wasn't there, even though his own attorneys told you that he did it.

> What does that say about a person? What kind of person can sit and listen to the 9-1-1 call that y'all heard [the appellant's daughter] describing her grandmother and mother dying before her eyes and show no emotion? What kind of person can sit there and look at autopsy photos of what he's done, his wife and mother-in-law's

## II. The Law

A criminal defendant who is incompetent may not be put to trial without violating due process.[16] "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial."[17] The constitutional standard for competency to stand trial asks whether the defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational

---

necks open, and show no emotion? What kind of person is that?

What does that say about a person? It says that they're a threat. It tells you that they're dangerous.

\* \* \*

He's shown absolutely no remorse and instead has done the complete opposite by saying he wasn't even there.

\* \* \*

You watched him testify during guilt/innocence. Do you remember he told you the story of how he went to his house and there was a man inside of his house? "I don't know who it was. It wasn't me. I wasn't there."

I know who was in his house and so do you. It was the Defendant. It was the Defendant. And it's not that he can't tell you; he won't. And just as we discussed during cross-examination of the Defendant, what kind of dangerous does that make him? What kind of dangerous does that make him? What kind of dangerousness is engendered in the lack of remorse?

[16] *E.g.*, *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) ("We have repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'") (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)).

[17] *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

understanding and whether he has a rational as well as factual understanding of the proceedings against him.[18]  Due process also mandates state procedures that are adequate to assure that incompetent defendants are not put to trial.[19]  To that end, our statutory scheme has codified the constitutional standard for competency to stand trial and has elaborately described the circumstances that require, and procedures for making, a determination of whether a defendant is competent to stand trial.[20]

## A.  Substantive Standard

The Texas Legislature has adopted the constitutional standard for competency to stand trial in Article 46B.003(a) of the Texas Code of Criminal Procedure.[21]  The appellant in this case does not contend that he lacked at least a factual understanding of the proceedings against him.  There is no reason to doubt that he understood that his life and liberty were at stake and what roles the various participants in the proceedings played.  At issue is whether there was any substantive indication that he lacked either a rational understanding of the proceedings or a present sufficient ability to consult with counsel with a reasonable degree

---

[18] *Dusky v. United States*, 362 U.S. 402, 402 (1960).

[19] *Pate v. Robinson*, 383 U.S. 375, 378 (1966).

[20] TEX. CODE CRIM. PROC. ch. 46B, subch. A-C.

[21] *See* TEX. CODE CRIM. PROC. art. 46B.003(a)(1) & (2) ("A person is incompetent to stand trial if the person does not have . . . sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or . . . a rational as well as factual understanding of the proceedings against the person.").

of rational understanding—or, as the trial court in this case ordered Dr. Almeida to assess, whether he was "able to rationally assist his lawyers in the defense of his case."

The Legislature apparently regards a defendant's capacity to rationally assist in the preparation and execution of his defense to be indispensable to a defendant's competency to stand trial. We may infer this from the fact that it has directed that forensic psychologists and psychiatrists appointed by the trial court to perform competency evaluations should specifically consider, among other things: 1) the defendant's "capacity . . . during criminal proceedings to . . . *engage* in a *reasoned* choice of legal strategies and options;" as well as 2) "the impact of the mental illness or mental retardation, if existent, on the defendant's capacity *to engage with counsel in a reasonable and rational manner*[.]"[22] These legislative criteria for competency contemplate a defendant who is at least minimally able to interact with his trial counsel in a "reasonable and rational" way (even if they do not necessarily agree) in formulating decisions how most effectively to pursue his defense.

Other jurisdictions have construed the constitutional standard for competence to stand trial consistent with this understanding. Various courts have declared defendants to be incompetent under the constitutional standard upon findings that they suffered from mental

---

[22] TEX. CODE CRIM. PROC. art. 46B.024 §§ (1)(C) & (4) (emphasis added). (Section 4 of Article 46B.024 was amended in 2011, after the appellant's trial, and presently reads: "the degree of impairment resulting from the mental illness or mental retardation, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner." Acts 2011, 82nd Leg., ch. 822, § 7, p. 1897, eff. Sept. 1, 2011.). *See Morris v. State*, 301 S.W.3d 281, 285-86 & n.10 (Tex. Crim. App. 2009) (factors listed in Article 46B.024 are "relevant" to the determination of competency, including whether the defendant can "engage in a reasoned choice of legal strategies and options").

illnesses causing paranoid delusions that impacted their perception of reality in ways that adversely affected their ability to rationally comprehend the proceedings against them or interact rationally with trial counsel.[23] And we think there is particular cause for concern

---

[23]

*See, e.g., Commonwealth v. Kennedy*, 305 A.2d 890 (Pa. 1973) (evidence did not support trial court's finding that the appellant was competent to stand trial when testimony showed without contradiction that he suffered from paranoid schizophrenia and his mental illness prevented him from cooperating with trial counsel); *State v. Pedersen*, 309 N.W.2d 490, 501 (Iowa 1981) (although the defendant appeared to have a factual understanding of the proceedings against him, delusions fueled by schizophrenia prevented him from cooperating with defense counsel, rendering him "unable to assist effectively in his defense"); *United States v. Blohm*, 579 F.Supp. 495, 505 (S.D.N.Y. 1983) (*Dusky* standard not satisfied when, although he had factual understanding of the proceedings, the defendant harbored certain delusional beliefs that rendered him "unable to consult with his lawyer and assist in his own defense"); *Strickland v. Francis*, 738 F.2d 1542, 1551 (11th Cir. 1984) (overturning a state-court finding that the applicant was competent to stand trial because expert testimony overwhelmingly established that his mental illness caused delusions that rendered him "unable to understand the nature of the proceedings against him and to participate meaningfully in his defense"); *United States v. Hemsi*, 901 F.2d 293, 296 (2nd Cir. 1990) (evidence supported the trial court's finding of incompetency because the appellant's "major psychiatric disorder and his impaired sense of reality prevented him from focusing on his legal needs and from acting effectively on his intellectual understanding, and would prevent him from cooperating rationally in his defense"); *Lafferty v. Cook*, 949 F.2d 1546, 1556 (10th Cir. 1991) (state court erred to find the applicant competent on the basis of a simple factual understanding of the proceedings against him where his paranoid delusions rendered him unable "to realistically determine where his best interests lie"); *United States v. Boigegrain*, 155 F.3d 1181, 1189-90 (10th Cir. 1998) (evidence sufficient to support trial court's finding of incompetency when "the defendant was delusional and suffered from 'paranoid ideation,' causing him to believe that his lawyer was participating in a conspiracy, along with the prosecutor and the judge, to incarcerate him for reasons unrelated to the charge against him"); *United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (evidence sufficient to support trial court's finding of incompetency because, though the defendant had a factual understanding of the proceedings against him, "that understanding was not rational because it was premised on his delusion of a government conspiracy working against him, including the doctors, lawyers, and the court"); *People v. Mondragon*, 217 P.3d 936 (Colo. App. 2009) (trial court erred to find the defendant competent based on factual understanding of the proceedings alone when his mental illness prevented him from making a rational decision whether to testify in his own behalf). *See also Wilcoxson v. State*, 22 S.W.3d 289, 305 (Tenn. Crim. App. 1999) ("[C]ourts have acknowledged that, even if a criminal defendant has an intellectual understanding of the charges against him, he may be incompetent if his impaired sense of reality substantially undermines his judgment and prevents him from cooperating rationally with his lawyer[.]"). Other courts have followed suit, albeit in unpublished decisions. *See United States v. Nagy*, No. 96 CR 601(RWS), 1998 WL 341940, at

when a defendant's mental impairment directly touches upon certain fundamental decisions that the criminal justice system reserves for him to make personally—albeit after "engaging" meaningfully with counsel—such as whether to testify in his own defense.[24] Precisely because the defendant retains ultimate authority over these decisions, it is critical that he be able "to consult with counsel with a reasonable degree of rational understanding" about them.[25]

---

*7 (S.D.N.Y. June 26, 1998) (the defendant's "understanding of the pending criminal proceedings is necessarily skewed by his [delusional] belief that there is a conspiracy against him involving, among others, judges, the Government, a priest, his landlord, and all psychiatrists who have examined him"); *United States v. Bauman*, No. 07-20052-KHV, 2008 WL 2560706, at *7 (D. Kan. June 26, 2008) (notwithstanding evidence that the defendant had a factual understanding of the proceedings, the trial court "finds that due to a delusional disorder, defendant lacks sufficient contact with reality to the extent that he cannot rationally consult with or cooperate with his attorney in this case"); *Aldridge v. Thaler*, No. H-05-608, 2010 WL 1050335, at *33 (S.D. Texas March 17, 2010) ("Without the ability to make crucial decisions and add relevant information to the defense, communication [with counsel] does not amount to the consultation or assistance required by the Supreme Court."); *State v. Williamson*, No. 1106025042, 2013 WL 268981, at * 9 (Del. Super. Ct. January 23, 2013) ("[D]efense lawyers must provide the best defense consistent with the client's direction. However, when delusions infect the process with fanciful aberrations, the trial would be a mockery of justice. Where a psychotic disorder precludes a meaningful defense, then no one can be subject to the gauntlet of trial.").

[24] *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (in a criminal case, "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal"); *Ex parte Mines*, 26 S.W.3d 910, 915 (Tex. Crim. App. 2000) ("Another reason for requiring competency at trial is that the defendant must make significant choices that require the advice of counsel but that are ultimately decided by the defendant. The defendant must be competent to decide whether to invoke or to waive such personal constitutional rights.") (citations omitted).

[25] *See Mondragon*, *supra*, at 942 ("[I]f defendant's mental disease or defect rendered him incapable of deciding rationally whether to testify, then, because of the nature of that right, he necessarily lacked the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and the requisite factual and rational understanding of the proceedings against him.").

This is not to imply that a defendant's mental illness plus his failure to communicate with counsel will invariably or necessarily add up to a finding of incompetence. The fact that a defendant is mentally ill does not by itself mean he is incompetent.[26] Nor does the simple fact that he obstinately refuses to cooperate with his trial counsel.[27] Indeed, even a mentally ill defendant who resists cooperating with his counsel may nevertheless be found competent if the manifestations of his particular mental illness are not shown to be the engine of his obstinacy.[28] But when a defendant's mental illness operates in such a way as to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interests, he cannot be made to stand trial consistent with due process. Evidence that raises this possibility necessitates an informal inquiry, and if that inquiry reveals that the possibility is substantial, a formal competency trial is required.

## B. Procedure

Under our current statutory scheme,[29] any "suggestion" of incompetency to stand trial

---

[26] *Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999); *Bouchillon v. Collins*, 907 F.2d 589, 593 (5th Cir. 1990).

[27] *See Reed v. State*, 112 S.W.3d 706, 710 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("It is not enough for counsel to allege unspecified difficulties in communicating with the defendant.") (citing *Moore*, *supra*, at 394).

[28] *Loftin v. State*, 660 S.W.2d 543, 546-47 (Tex. Crim. App. 1983).

[29] In 2003, the Legislature comprehensively revised the procedures governing determinations of competency to stand trial, repealing former Article 46.02 of the Texas Code of Criminal Procedure, and replacing it with current Chapter 46B. *See* Acts 2003, 78th Leg., ch. 35, §§ 1 & 15, pp. 57-68 & 72, eff. Jan. 1, 2004.

calls for an "informal inquiry" to determine whether evidence exists to justify a formal competency trial.[30] In 2009, this Court held that evidence that a "suggestion" of incompetency sufficient to trigger an informal inquiry was the same as the *bona fide* doubt standard from the previous statutory regime.[31] The Legislature has subsequently rejected the *bona fide* doubt standard for purposes of Article 46B.004, but the amendment by which this was accomplished did not become effective until September 1, 2011, several months after the appellant's trial.[32] In any event, here, at least as of May 20, 2011, when voir dire was interrupted for the hearing at which Dr. Almeida testified, the trial court was obviously persuaded that a *bona fide* doubt *did* exist as to the appellant's competency.

The question therefore becomes whether, in light of what became known to the trial

---

[30]

*See* TEX. CODE CRIM. PROC. art. 46B.004(c) ("On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.").

[31]

*Montoya v. State*, 291 S.W.3d 420, 425 (Tex. Crim. App. 2009) ("suggestion" means the same as *bona fide* doubt under former statutory provisions; hence, "[i]f a trial judge has a *bona fide* doubt about the competency of the defendant, he or she shall conduct an informal inquiry to determine if there is evidence that would support a finding of incompetence"). *Cf. Alcott v. State*, 51 S.W.3d 596, 600-01 (Tex. Crim. App. 2001) (under the former statutory scheme, *bona fide* doubt triggered competency inquiry during which the trial court must determine whether there is "some evidence" to support a finding of incompetency so as to trigger a formal competency hearing).

[32]

*See* Acts 2011, 82nd Leg., ch. 822, §§ 2 & 21(b), p.1895 & 1901, eff. Sept. 1, 2011 (adding Subsection (c-1) to Article 46B.004 to provide that: "A suggestion of incompetency is the threshold requirement for an informal inquiry under Subsection (c) and may consist solely of a representation from any credible source that the defendant may be incompetent. A further evidentiary showing is not required to initiate the inquiry, and the court is not required to have a bona fide doubt about the competency of the defendant.").

court by the conclusion of this informal inquiry, it should have conducted a formal competency trial. The answer depends upon whether "some evidence from any source" had arisen by that time "that would support a finding that [the appellant] may be incompetent to stand trial."[33] In making this determination, a trial court must consider only that evidence tending to show incompetency, "putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency."[34] If so, then "evidence exists to support a finding of incompetency," and the statutory scheme requires the trial court to conduct a formal competency trial.[35]

---

[33]

TEX. CODE CRIM. PROC. art. 46B.004(c).

[34]

*Ex parte LaHood*, 401 S.W.3d 45, 52-53 (Tex. Crim. App. 2013) (quoting *Sisco v. State*, 599 S.W.2d 607, 613 (Tex. Crim. App. 1980) (plurality opinion)). *See also Williams v. State*, 663 S.W.2d 832, 834 (Tex. Crim. App. 1984) (applying *Sisco*, and construing prior statutory language that required a formal competency hearing upon a determination that there is evidence from any source "to support a finding of incompetency to stand trial"); *Barber v. State*, 737 S.W.2d 824, 828 (Tex. Crim. App. 1987) (same); George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:36, at 49 (3rd ed. 2011) ("The language used [in the current statutory scheme] for the standard to determine whether a hearing must be held is identical to that in the former statute determining whether a jury trial was required. This clearly incorporates the case law development of that criterion[.]").

[35]

*See* TEX. CODE CRIM. PROC. art. 46B.005(a) & (b) (if informal inquiry reveals "that evidence exists to support a finding of incompetency," then the trial court should order an expert examination and "shall hold a trial . . . before determining whether the defendant is incompetent to stand trial"); George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:53, at 63 (3rd ed. 2011) ("A trial on the merits of the competency issue is apparently required if the trial court determines that evidence exists to support a finding of incompetency. This standard uses the same terminology as former . . . Article 46.02, section 4(a) of the Code of Criminal Procedure. Almost certainly, it will be given the same interpretation as that prior statutory language."). If "evidence exists to support a finding of incompetency," a trial is mandated unless

Should the formal competency trial result in a finding of competency, the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated.[36] However, especially when there has been a suggestion of incompetency but no formal adjudication of the issue, due process requires the trial court to remain ever vigilant for changes in circumstances that would make a formal adjudication appropriate.[37] In the instant case, we find no fault in the trial court's failure to conduct a formal competency trial following the initial evaluations by Drs. Gollaher and Axelrad, since they deemed the appellant to be competent. After all, the appellant's trial counsel made no request for a formal competency trial at that time. But as of May 20, 2011, when the trial court concluded its informal inquiry, there was some evidence to support a rational finding of incompetence, and, for the reasons that we describe below, the appellant's request for a formal competency trial should then have been granted.

### III. Analysis

Shortly after indictment in April of 2010, and before the appellant was afforded much

---

the parties can agree without a trial that the defendant is incompetent. TEX. CODE CRIM. PROC. arts. 46B.005(a)-(c), 46B.054. Unlike the former statutory regime, which required that a jury be empaneled to determine competency, under the current statute, the trial court makes the ultimate determination with respect to competency unless either of the parties or the trial court itself registers a preference that "a jury shall make that determination." TEX. CODE CRIM. PROC. art. 46B.051.

[36] E.g., *Ferguson v. State*, 579 S.W.2d 2, 4-5 (Tex. Crim. App. 1979); *Bigby v. State*, 892 S.W.2d 864, 885 (Tex. Crim. App. 1994).

[37] See *Drope*, *supra*, at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").

of an opportunity to interact with Gonzalez, his first-appointed trial counsel, both Dr. Gollaher and Dr. Axelrad deemed him competent to stand trial. The record does not show that the appellant had a history of mental illness. Nevertheless, both of the competency reports reflect the substantial possibility that he was suffering from paranoia that may have been the product of "a paranoid disorder," and that he was apparently exhibiting delusions. Gollaher expressly found that the appellant had a factual understanding of the proceedings and could "communicate events in an understandable manner and can report his state of mind." But her report did not speak specifically to whether his condition would adversely affect his capacity either to "engage with counsel in a reasonable and rational manner[,]" or to "engage in a reasoned choice of legal strategies and options[.]"[38] Axelrad's report *did* speak to those capacities and, in fact, he found the appellant to be "mildly impaired" with respect to both. Axelrad noted that, "[i]n the event [that the appellant] has a paranoid disorder, this may be contributing to the problems he is experiencing with his attorney." Notwithstanding the experts' ultimate conclusions that the appellant was competent, the trial court was effectively put on notice of the need to maintain vigilance to assure that the appellant's due process rights were preserved.

Barely over a month after the initial evaluations, the appellant's attorneys were already experiencing "a little bit of a disconnect" with him. By November of 2010, the appellant had filed a grievance against his lawyers and requested a new "defense team." In December,

---

[38] TEX. CODE CRIM. PROC. art. 46B.024(4) & (1)(C), respectively.

Gonzalez's continued representation of the appellant became "untenable" after the appellant threatened him with physical violence over their disagreement with the defense strategy to depose the appellant's children. By April of 2011, it began to emerge that the appellant's displeasure with trial counsel involved more than the depositions alone; he was also upset that trial counsel were not pursuing a sufficiently vigorous investigation into his apparently delusional—and, in any event, clearly irrelevant—claim that the Mayor of Kendleton had sired his youngest child. According to Moncriffe, "He seems to have one train of thought and he disregards all other rational thoughts completely." The appellant's paranoia had progressed to the point that, if the representations of his own lawyers are to be credited, he believed that they were openly conspiring with the prosecutors to secure his conviction. He flatly refused to communicate with them during the voir dire proceedings.

We think the preceding information constitutes at least some evidence that would support a rational finding that the appellant lacked the capacity to "engage" with his trial counsel rationally or to make rational choices with respect to his legal strategies and options. In finding otherwise at the conclusion of the informal inquiry on May 20, 2011, the trial court made two mistakes. First, the trial court focused erroneously on evidence of competency rather than evidence of incompetency, relying upon the ultimate conclusions of Drs. Gollaher and Axelrad, as well as Dr. Almeida's subsequent opinion that the appellant's cognitive functioning had not significantly changed in the interim. But Almeida was unable to say that the appellant was competent to assist counsel in his defense, and both Gollaher and Axelrad

observed signs of paranoid delusions that would at least minimally support a finding that the appellant suffered from a mental disorder that impaired his ability to participate rationally in the preparation and presentation of his defense. The interactions between the appellant and his trial counsel in the intervening months constituted substantial evidence that Axelrad's nascent concerns about the appellant's capacity to consult rationally with his attorneys were subsequently borne out. There was some evidence that would rationally support a finding of incompetency to stand trial, notwithstanding other evidence to the contrary.

Second, the trial court erred to the extent that it denied the appellant's request for a formal competency trial on the grounds that the appellant failed to demonstrate any "change" of status since the earlier findings of competency by Gollaher and Axelrad. There was no adjudication of the competency issue in the summer of 2010 following their evaluations—not even an informal inquiry to decide whether there was sufficient evidence at that time to invoke a formal competency trial. Thus, there was no prior judicial competency determination to justify a requirement of a change in circumstances. Moreover, even had there been some previous judicial finding of competency, the trial court was mistaken to conclude that no new circumstances existed to merit a second look. By May of 2011, there had arisen new evidence in the form of the appellant's obviously irrational belief that his ongoing delusion with respect to the Mayor of Kendleton somehow provided him with a defense to prosecution for capital murder that was preferable to the approach that his trial lawyers urged him to pursue. That the appellant persisted in this delusion-fueled belief

against the emphatic advice of counsel, together with the earlier suggestions that he suffered from a paranoid disorder, was enough to raise the likelihood of incompetency to a level beyond that which is evinced by a mere dispute between an ordinarily obstinate defendant and his legal counsel over plausible trial strategies. It is at least some evidence to support a rational finding that, because of mental illness, the appellant was unable to engage rationally with his lawyers and was therefore incapable of participating rationally in his own defense.[39] Most critically, he may well have been incapable of making a rational, non-delusional decision with respect to whether or not to accept his trial counsel's advice not to

---

[39]

In her dissenting opinion, Judge Keller relies heavily upon the lack of expert opinion that there was any "current evidence to substantiate a delusional or other psychiatric disorder." Dissenting Opinion at 6. It is true that none of the experts in this case ultimately expressed such an opinion. However, it is not evident why the opinion of an expert should be considered indispensable to raising incompetency—especially considering our holding that an expert's opinion is *not* necessary to raise the defense of insanity (which, unlike the standard for incompetency to stand trial, expressly requires a finding that the defendant's condition be "a result of severe mental disease or defect"). *Cf. Pacheco v. State*, 757 S.W.2d 729, 736 (Tex. Crim. App. 1988) ("[W]e hold that predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise the issue [of insanity]."); TEX. PENAL CODE § 8.01(a). And while none of the experts here stated unequivocally that the appellant is mentally ill, both Gollaher and Axelrad noted the possibility of paranoid and delusional thinking on his part, and Axelrad observed that he was "an individual who may have a mental illness and [that] the diagnosis may be a paranoid disorder." Axelrad even found appellant to be at least "mildly impaired" on that account in his ability to rationally engage with counsel about the case and about his choice of legal strategies and options. Almeida's conclusion that the appellant displayed no delusional disorder was based upon her perception that there were "no significant changes in [the appellant's] emotional or cognitive functioning" since the year-old evaluations of Gollaher and Axelrad. She took no account of the appellant's subsequent behaviors that might serve to substantiate the initial impressions of Gollaher and Axelrad that he may suffer from a "mental illness" that "may be a paranoid disorder." These circumstances constitute *some* evidence—at *least* "more than none or a scintilla," *see* note 34, *ante*—that the appellant suffers from a debilitating mental illness—enough that, in combination with some evidence of the other two factors, it may be said "that evidence exists to support a finding of incompetency" for purposes of a formal competency trial under Article 46B.005.

testify.[40]

We hasten to emphasize the limited scope of our holding today. This is not a case in which there is some evidence of mental illness but no evidence from which it may reasonably be inferred that the defendant's mental illness renders him incapable of consulting rationally with counsel. Nor is it a case in which there is some evidence that the defendant obstinately refuses to cooperate with counsel but nothing from which to rationally infer that his obstinacy is fueled by mental illness. It is not even a case in which there is some evidence of mental illness, some evidence of obstinacy, but ultimately no rational basis to infer that the obstinacy is a *product* of the mental illness. None of these scenarios would compel a formal

---

[40]
    Supposing (without deciding) that the appellant was incompetent, it is not difficult to imagine how his delusional beliefs could have tainted the trial process. Taking the witness stand against the advice of counsel, he proceeded to testify at odds with the defensive posture of his lawyers based upon a wholesale denial of responsibility that was worse than implausible. This opened the door for the prosecutors to expose the irrationality of his account on cross-examination and then to highlight, at both the guilt and punishment phases of trial, that his willful refusal to acknowledge blame was nothing but a clear signal of his enduring threat to society. To the extent that the appellant's disastrous decision to testify was the product of a conflict with trial counsel that derived from a paranoid pathology, it is constitutionally intolerable. The trial court erred not to conduct a formal competency trial that could have ruled out that substantial possibility before proceeding to trial on the indictment.

    We do not mean by these observations to suggest that due process error in putting an incompetent defendant to trial is necessarily subject to a constitutional harm analysis. Although at least one court has held such error to be "structural," *Mondragon*, *supra*, at 942-43, neither the United States Supreme Court nor this Court has yet declared whether the due process violation of trying an incompetent defendant constitutes the type of constitutional error, such as those enumerated most recently in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006), that is not susceptible to a harm analysis. We have no occasion to decide that question today. We simply point out that, if on remand the appellant in this case should indeed be found to be incompetent to stand trial, it is not hard to see how his incompetency had an obviously deleterious impact on the conduct of his trial, and particularly, his exclusive decision whether or not to testify.

competency trial. Instead, this case presents one of the relatively rare instances in which there is at least *some* evidence from which it may rationally be inferred *not only* 1) that the defendant suffers some degree of debilitating mental illness, and that 2) he obstinately refuses to cooperate with counsel to his own apparent detriment, *but also* that 3) his mental illness is what fuels his obstinacy. Whenever a trial court's informal inquiry establishes that there is some evidence that could rationally support all three of these inferences, it should conduct a formal competency trial.

Therefore, bearing firmly in mind that the standard for requiring a formal competency trial is not a particularly onerous one—whether, putting aside the evidence of competency, there is more than a scintilla of evidence that would support a rational finding of fact that the accused is incompetent to stand trial[41]—we hold that the trial court erred in failing to grant the appellant's request for a formal competency trial under Article 46B.005.

## DISPOSITION

Accordingly, we sustain the appellant's ninth point of error, abate the appeal, and remand the cause to the trial court. On remand, the trial court shall first determine whether it is presently feasible to conduct a retrospective competency trial, given the passage of time, availability of evidence, and any other pertinent considerations.[42] Should the trial court deem

---

[41] *See* note 34, *ante*.

[42] *See* George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:81, at 89-90 & n.10 (3ʳᵈ ed. 2011) (citing, *e.g.*, *Torres v. State*, 593 S.W.2d 717, 719 (Tex. Crim. App. 1980) (remanding to trial court to decide, *inter alia*, whether "a nunc pro tunc

a retrospective competency trial to be feasible, it shall proceed to conduct such a trial in accordance with Chapter 46B, Subchapter C, of the Code of Criminal Procedure.[43] Regardless of whether the trial court deems a retrospective competency trial to be feasible, the record of the proceedings on remand shall then be returned to this Court for reinstatement of the appeal.[44]

DELIVERED:      October 30, 2013
PUBLISH

---

determination of appellant's competency is not possible"); *Ex parte McKenzie*, 582 S.W.2d 153, 155 (Tex. Crim. App. 1979) (remanding case to the trial court to "determine if it is possible to conduct a nunc pro tunc competency hearing and, if it is, to hold such a hearing" under the then-extant competency-to-stand-trial statute); *Ex parte Winfrey*, 581 S.W.2d 698, 699 (Tex. Crim. App. 1979) (holding that the original competency hearing suffered from a flawed jury instruction, this Court remanded to the trial court for a determination whether, *inter alia*, a retrospective competency hearing was feasible)).

[43] TEX. CODE CRIM. PROC. ch. 46B, subch. C.

[44] This Court has sometimes disposed of other appellate points of error on original submission before remanding a cause for a retrospective competency determination. *E.g.*, *Brandon v. State*, 599 S.W.2d 567, 574 (Tex. Crim. App. 1979) (opinion on original submission); *Barber v. State*, 737 S.W.2d 824, 829 (Tex. Crim. App. 1987). Three of the appellant's remaining points of error in this case, however, involve the issue of whether he should have been allowed to represent himself at various points at trial. *See* note 13, *ante*. The ultimate resolution of the issue of his competency to stand trial may prove to have some bearing on these points of error. *See Indiana v. Edwards*, 554 U.S. 164, 178 (2008) ("[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."). We therefore believe that resolution of these self-representation claims, if necessary, would best await our opinion after remand. The appellant's remaining points of error involve claims that the State exercised certain peremptory challenges to discriminate against African-American veniremen and that the trial court erred in failing to bench warrant the appellant from the penitentiary to assure his attendance at the motion for new trial hearing. The resolution of these claims also may prove unnecessary. In order to avoid resolving the appellant's points of error piecemeal—some now and some later—we will abstain from addressing any of them unless and until it should become necessary to do so in our opinion after remand.