

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00532-CR

ELMER BROWN                                                        APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

## FROM COUNTY CRIMINAL COURT NO. 4 OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Elmer Brown appeals his conviction for deceptive business practice. We affirm.

## Background Facts

In early 2007, Bonnie Serben sought bids from contractors to repair and remodel her mother's house. In May 2007, she received a bid from Appellant's

---

[1]*See* Tex. R. App. P. 47.4.

company, Brown and Company. Appellant proposed to, among other things, replace the roof and siding, replace the exterior doors and windows, replace the septic tank system, install skylights, perform landscaping, rewire the electrical system, install a HVAC system, replace sheetrock and insulate the walls, install cabinets and bathroom fixtures, and refinish the hardwood floors.

Serben and Appellant negotiated a contract for Appellant's services. Serben agreed to pay Appellant $118,176. The contract stipulated that Serben would pay $35,963 of the contract price as a deposit "to be used by [Appellant] for the purchase of all exterior materials, equipment, and tools required and permits necessary to begin the Work." Serben agreed to pay for the rest of the services as they were completed upon submission of a payment request by Appellant. The contract stated,

> The submission of a payment request by Contractor will constitute a representation by Contractor to Owner that the Work has progressed to the point indicated and that, to the best of Contractor's knowledge, information[,] and belief, the quality of the Work is in accordance with this Agreement and generally accepted industry standards applicable in Texas.

The parties agreed that Serben would retain 15% of each invoice amount for thirty days after completion of the entire project. The contract also provided for an early completion bonus if Appellant completed the work in one hundred working days and a late completion penalty if Appellant did not finish the project within 146 working days. The parties signed the contract in June 2007.

Serben received an invoice for the deposit ($30,568.55 after the 15% retainage), which she paid by check on June 16, 2007. Serben received a second invoice on June 26, 2007, for $6,800 for the installation of the roof. She paid that invoice by check on July 2, 2007. Serben received a third invoice also dated June 26, 2007 for $24,990 for "interior demolition," "clear[ing] debris/shrubs," "remov[ing] trees/prun[ing] trees," and electrical wiring and materials, air conditioning unit and duct materials and accessories, and copper lines for plumbing. Serben paid that invoice by check on July 7, 2007.

In September 2007, Serben requested and received a cost report from Appellant showing how the funds had been applied. In the cost report, Appellant stated that he had performed and bought material for $46,671 worth of work, including installing the skylights, cabinets, and the HVAC system and performing electrical and plumbing work, none of which had actually been performed. The cost report also included $5,099 for "Administrative."

Also in September 2007, Serben requested a contract change order adding $6,339 of work to the contract. On September 14, 2007, Serben received a fourth invoice for $12,196.95 for siding, tree trimming, insulation and drywall installation, and a number of the items from the change order. Serben paid the invoice by check on September 15, 2007.

In early October 2007, Serben attempted to reach Appellant because "nothing was getting done" on the house. She called him "[n]umerous times," but he did not answer the phone and eventually the number was disconnected. On

3

October 8, 2007, Appellant emailed Serben and said that he had been away at his grandmother's funeral in Arkansas and that he had "a very ag[gressive] schedule to make up for lost time." He told Serben that he was expecting to complete the project some time in November. Serben testified that Appellant did no more work after he sent that email. None of the things that Appellant said in the email he would complete, such as installing the HVAC system, completing the plumbing, installing the sheetrock, and finishing the carpentry work, were completed.

On November 20, 2007, Serben's husband, John, emailed Appellant a letter regarding what work still needed to be completed on the house. The letter said,

> It continues to be very difficult to contact you. You don't answer your cell phone and never seem to empty your cell phone mailbox, and, as a result, we cannot leave messages for you! . . . In addition, you have not shown up for several meetings with us that you requested.

John told Appellant,

> It is obvious that there has been no activity by you [on the house] in nearly two months. . . . Your delays have caused us considerable anxiety, problems, time, money, disruption to our personal plans, inconvenience, etc[.], over your inability, desire, and wherewithal [to] do what you committed to do. **And, may I remind you, that we have paid you in advance, far more than the work completed thus far can justify**.

In the email, John also said, "You have not delivered to us copies of paid invoices and the written proof of releases from your subcontractors as we have requested several times and is specified in our contract with you." He told

4

Appellant that under the contract, he had until January 24, 2008 to complete the project.

On November 24, 2007, Appellant responded to the letter. He told the Serbens that he had been waiting for the windows to be installed and that he had "everyone scheduled to go in at the end of th[at] week." He disputed the Serbens' calculation of the last day of the contract period but said, "Once we begin, the final product should not take long to complete." Serben received no further communications from Appellant.

On December 3, 2007, Serben emailed Appellant again and stated that still no more work had been done on the house. She said, "At this point, we would be happy to cancel the contract and either get the money we advanced for materials returned to us, or alternately, the materials that you purchased with that money!" She received no response from Appellant.

On January 23, 2008, Serben sent Appellant a letter stating that she was cancelling the contract. Serben also filed a complaint against Appellant with the Better Business Bureau and with the Flower Mound Police Department. A police detective assigned to the case spoke to Appellant by phone. Appellant told the detective that he had gotten sick and had turned the project over to somebody else. The detective asked to speak to Appellant in person. Appellant said he was in Houston for two weeks but that he would call when he got back to town. When the detective did not hear from Appellant, he forwarded the case to the District Attorney's office.

In February 2009, Appellant was charged with committing a deceptive business practice. Trial was originally set for November 2011 but was reset repeatedly until it was finally set for August 7, 2012. On July 30, 2012, Appellant filed a motion for continuance stating,

> [Appellant] is a severe diabetic who has been hospitalized numerous times since May 2012 in attempt to deal with the effects of his diabetes. [Appellant] has a cataract in his left eye that has completely blinded him and his right eye has a cataract that is diminishing his eyesight as well. [Appellant] has been scheduled for oral surgery on his jaw for August 1, 2012; retinal surgery on his right eye for August 7, 2012; and cataract surgery for August 31, 20[12].

The trial court spoke on the phone to Appellant's doctors and, at a pretrial hearing, told the parties that "they said he should be fine to come up here and sit with [his attorney] on the day after" the August 7 surgery. The trial court denied Appellant's motion for continuance and set trial for August 9, 2012.

On August 9, 2012, before trial began, Appellant reurged his motion for continuance. Appellant's wife testified that he had been prescribed hydrocodone and that he did not appear to have a rational, cogent understanding of things she would tell him because he was on so many medications. She did not believe that he was able to aid his lawyer in effectively representing him. Appellant's attorney testified that he had attempted to go over documents with Appellant but "he would act as if he thought he understood what was in it, but appeared to be confused by what the document was." Based on Appellant's inability to see or read documents or seemingly understand what his attorney would tell him, his

6

attorney testified, "But I don't believe, based upon all of those things, that I can effectively represent [Appellant] in his current condition." The trial court reviewed the side effects of hydrocodone but noted that Appellant's doctors "did not see fit to tell [the court] that they expected him to have such reactions and be unable to perform—be here today." The trial court denied the motion for continuance again.

A jury convicted Appellant of a deceptive business practice. The trial court sentenced him to spend 360 days in jail, suspended the punishment, and placed Appellant on community supervision for twenty-four months. Appellant then filed this appeal.

## Discussion

### I. Competency inquiry

In Appellant's first issue, he argues that the trial court erred by denying his motion for continuance. Specifically, he argues that the trial court erred by failing to conduct an informal competency inquiry. We review a trial court's ruling on a motion for continuance and its failure to inquire into a defendant's competency to stand trial under an abuse of discretion standard. *Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999), *cert. denied*, 530 U.S. 1216 (2000). A trial court abuses its discretion if its decision is arbitrary or unreasonable. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).

Appellant had the burden to prove by a preponderance of the evidence that he was incompetent to stand trial. *See* Tex. Code Crim. Proc. Ann. art.

7

46B.003(b) (West 2006); *Morris v. State*, 301 S.W.3d 281, 285 (Tex. Crim. App. 2009). Incompetency to stand trial is defined as a lack of

> (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or

> (2) a rational as well as factual understanding of the proceedings against the person.

Tex. Code Crim. Proc. art. 46B.003(a). A defendant is presumed to be competent unless proved incompetent by a preponderance of the evidence. *Id.* at 46B.003(b). However, "any 'suggestion' of incompetency to stand trial calls for an 'informal inquiry' to determine whether evidence exists to justify a formal competency trial." *Turner v. State*, No. AP-76580, 2013 WL 5808250, at *11 (Tex. Crim. App. Oct. 30, 2013); *see* Tex. Code Crim. Proc. art. 46B.004 (West Supp. 2013) ("On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial."). "'Some evidence' is a low bar; it requires a showing of only a quantity more than none or a scintilla." *Brown v. State*, No. PD-1723-12, 2014 WL 1032054, at *5 (Tex. Crim. App. Mar. 19, 2014) (citing *Turner*, 2013 WL 5808250, at *11). Evidence showing incompetence may include truly bizarre behavior by the defendant or a recent history of "severe mental illness or at least moderate mental retardation." *Montoya v. State*, 291 S.W.3d 420, 425 (Tex. Crim. App. 2009), *superseded by statute on other grounds as stated in Turner*, 2013 WL 5808250, at *11 & n.31.

8

The record shows that the trial court conducted an informal inquiry into Appellant's competency to stand trial, once on July 30, 2012, and again on August 9, 2012. See *Grizzard v. State*, No. 01-06-00930-CR, 2008 WL 2611865, at \*5 (Tex. App.—Houston [1st Dist.] July 3, 2008, no pet.) (mem. op., not designated for publication) (holding that trial court conducted an informal inquiry when it allowed testimony from defendant's wife and doctor concerning defendant's "voluntary overdose of prescription medication").

The trial court spoke with Appellant's doctor on July 30, 2012. The doctor told the trial court that Appellant "should be fine to come up here and sit with [his attorney]" and that he "could come to trial as long as he didn't have to drive." Appellant's attorney stated his concern that Appellant would be unable to see, and the trial court said,

> THE COURT: Well, you'd better go call his doctor and get them to confirm with you how much they—but I want to resolve this today, yeah.
>
> [APPELLANT'S ATTORNEY]: That's fine.
>
> THE COURT: I mean, if he's got one eye and can see, I mean, you know . . . .
>
> [APPELLANT'S ATTORNEY]: No, no, as long as he can see, I don't care whether it's one eye or he can see out of his ear. I just need him to be able to see.
>
> THE COURT: Okay. Okay. Yeah, okay. Y'all go talk and you can go call your doctor and find out how good a shape he's going to be, but right now I'm wanting to start this next Thursday and do this case and get it done.

On August 9, 2012, the trial court also heard testimony from Appellant's wife and his attorney. Appellant's wife testified that Appellant had diabetes and high blood pressure and that he was taking hydrocodone. She said that Appellant's surgeries on his eyes had interfered with his vision and that he had headaches and was dizzy. She testified that Appellant's discharge instructions from the surgery center were "for him to basically not do anything strenuous, don't lift anything heavy, rest." She said that Appellant did not appear to have a rational, cogent understanding of things she said to him. She said,

> And then a lot of times I talk to him and I ask him something, I have to repeat myself because sometimes he's like, "I don't understand what you said. What are you talking about?" That's not him because usually, any other time, he's—you know, he's quick to pick up and understand what I'm saying.

She also testified that she showed him some documents, which he asked her to read to him, and although it "took him a while to even give [her] an answer," he told her the documents needed to go to his attorney.

Appellant's attorney testified that Appellant could not see or read documents he showed him. He said that Appellant "would act as if he thought he understood what was in [a document], but appeared to be confused by what the document was." He said, "I can say with all certainty he is not able to assist me to effectively represent him in this case today."

Appellant also testified at the hearing. He said, "I want to let the Court know that I understand this case and how long it's been going on, back and forth. . . . [A]nd I understand the court process." He explained,

10

>     [My attorney] knows, and I don't think the Court or the State know, that I've been ready to get this case over with since inception, since it was brought forth and explained to me originally some years ago.
>
>     That's pretty much what I wanted to say. I have been ready. Unfortunately, my health has taken a turn.

Appellant testified,

>     I couldn't understand some of the stuff that would normally be simple. Even this earlier here, I couldn't—I lost the train of thought in the middle of a sentence. And that's not me. I'm normally ready and on point, but this isn't me. And I'm at a severe disadvantage being here, and I think the Court should know that.

The trial court stated that it was going to look at the *Physicians Desk Reference* for the side effects of Appellant's prescription drugs. The trial judge said, "I need to look at that and see if hydrocodone would interfere with his mental abilities, because if it does, I'm going to continue this case. I don't want him to be able to not understand what's going on from a legal—from a medical position." He read from the book,

>     [T]he most frequently reported adverse reactions include lightheadedness, dizziness, sedation, nausea, and vomiting. And then under Central Nervous System, it says drowsiness, mental clouding, lethargy, impairment of mental and physical performances, anxiety, fear, psychic dependency, and mood changes.
>     But I have talked—and in speaking to the doctors, they have not told me—they did not see fit to tell me that they expected him to have such reactions and be unable to perform—be here today.

Although some evidence showed that Appellant's illnesses had diminished his vision and his medications may have diminished his comprehension skills, the testimony from Appellant, his wife, and his attorney was not evidence of the type

supporting an incompetency finding such as "truly bizarre behavior" or "severe mental illness or at least moderate mental retardation." *Montoya*, 291 S.W.3d at 425; *see also Grizzard*, 2008 WL 2611865, at *6 (holding that trial court did not abuse its discretion by not finding appellant incompetent when, among other things, "appellant had met with his trial attorney immediately before the sentencing phase began and the attorney represented to the court that appellant was aware of what was going on and wanted to participate in the punishment phase of the trial, but due to his medical condition was not able to be present"). That Appellant was slow to comprehend things and that he had trouble recalling details did not render him incompetent to stand trial. *See Morris*, 301 S.W.3d at 292–93 (stating that a defendant's amnesia is akin to "missing evidence," which does not give rise to a finding of incompetence) (citing *Morrow v. State*, 293 Md. 247, 254, 443 A.2d 108, 112 (1982)). Appellant's own testimony was that he understood the nature of the proceedings. Appellant's attorney stated that Appellant could not effectively assist in his representation, but his statement to the trial court that he "just need[ed Appellant] to be able to see" demonstrates that his concern was with Appellant's physical health, not his mental health. The trial court noted the possible side effects of hydrocodone, he also noted that Appellant's doctor did not say that Appellant was suffering from any mental impairment.

The record is completely devoid of any evidence that Appellant suffered from mental illness, mental retardation, or that he committed any truly bizarre

12

acts. Although Appellant's wife testified that he did not have a rational understanding of things, she also testified that when she showed him documents, he understood what they were and that they needed to go to his attorney. And although his attorney testified that Appellant was unable to assist him in his representation, the trial court stated, "From the evidence I have . . . , I have the direct impression that [Appellant] is very uncooperative with his attorney." Appellant's attorney did not testify that Appellant was unable to answer questions or provide information to such an extent that he could be found to have no reasonable degree of rational understanding. In fact, Appellant's attorney told the court that he did not think that Appellant needed a formal competency hearing. He said, "There's a whole process for that that involves either somebody being hospitalized and examined or having an independent expert appointed to look at him. I don't know that we need to get to that . . . ."

Appellant's slowed responses because of his illnesses did not rise to the level of legal incompetence. *See* Tex. Code Crim. Proc. art. 46B.003(a); *see also Gaines v. State*, No. 02-02-00498-CR, 2004 WL 2320367, at *5 (Tex. App.—Fort Worth Oct. 14, 2004, pet. ref'd) (mem. op., not designated for publication) ("[A] learning disability or attention deficit hyperactivity disorder is an insufficient basis to claim incompetence to stand trial."). The trial court told Appellant's attorney at the July 30, 2012 hearing to call Appellant's doctor to get a statement from the physician that Appellant would be unable to stand trial. Appellant did not provide any such statement at the August 9, 2012 hearing. In

13

fact, Appellant's testimony established his self-professed ability to understand the proceedings.

The court twice performed an informal inquiry and sought the opinion of medical professionals who had treated Appellant. The trial court's reliance on the doctor's opinion that Appellant could attend trial and its own assessment of the credibility of the witnesses was not an abuse of discretion. *See Little v. State*, No. 02-12-00086-CR, 2013 WL 5593297, at *3 (Tex. App.—Fort Worth Oct. 10, 2013, no pet.) (mem. op., not designated for publication) ("But Little points to nothing in the record that would compel this court to ignore the trial court's firsthand factual assessment of his mental competency, a finding that this court is bound to afford great deference to, or the trial court's reliance of an expert's determination that he was competent to stand trial.") (citing *McDaniel v. State*, 98 S.W.3d 704, 712 (Tex. Crim. App. 2003)). It was likewise not an abuse of discretion to refuse to grant the motion for continuance to conduct a formal incompetency hearing. We overrule Appellant's first issue.

## II. Sufficiency of the evidence

In Appellant's second issue, he argues that the evidence supporting the finding that he had the required mens rea is insufficient. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781,

14

2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). We must review circumstantial evidence of intent with the same scrutiny as other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–21 (Tex. Crim. App. 2009) (overruling *Margraves v. State*, 34 S.W.3d 912, 919 Tex. Crim. App. 2000)); *see Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999) ("Circumstantial evidence, by itself, may be enough to support the jury's verdict."). "In a sufficiency analysis, all of the evidence admitted at trial to support the conviction should be reviewed equally on appeal." *Laster*, 275 S.W.3d at 521.

Appellant was accused of intentionally or knowingly selling Serben less than the represented quantity of a property or service. *See* Tex. Penal Code Ann. § 32.42(b)(2) (West 2011). A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2011). A person acts knowingly "when he is aware of the nature of his conduct" or "when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

Between June and September 2007, Serben received and paid four invoices from Appellant totaling $74,555.50. Among the itemized items, Appellant charged Serben for clearing debris and shrubs, procuring permits, and purchasing and installing electrical materials, materials for "a/c unit, flex duct/accessories," copper lines, solar tubes for skylights, cabinets, insulation, sheetrock, and a house fan. Serben testified that Appellant cleared some but not all of the debris and shrubs, did not install any cabinets, and did not perform any electrical work or work on the HVAC. Serben testified that Appellant did not install any duct work, vents, insulation, sheetrock, or a house fan. Serben did not recall seeing any electrical materials or copper wiring on the property, and she only saw one solar tube. Serben testified that Appellant's permit from the Town of Flower Mound cost $300, that she was charged $800 for permits, and that she did not know of or see any other permits.

Despite assurances from Appellant on October 8, 2007 that he would complete the installation of the HVAC system, plumbing, sheetrock, and carpentry, Appellant took no steps to complete any of those services. Appellant sent Serben more assurances on November 24, 2007, but still did not do any more work on the house, and Appellant did not contact Serben again.

The evidence was that Appellant failed to deliver all of the construction services that he agreed to provide and for which he invoiced Serben. As the San Antonio court of appeals has explained,

16

[S]ection 32.42(b)(2) does not focus on a statement made in advance of the sale. Instead, section 32.42(b)(2) criminalizes "selling" less than the "represented" quantity. The term "sell" is defined in the statute as including "offer for sale, advertise for sale, expose for sale, keep for the purpose of sale, *deliver for or after sale,* solicit and offer to buy, and every disposition for value." Thus, the definition of sale encompasses the delivery stage of the sale in addition to the offer stage of the sale. Moreover, a determination of whether the quantity sold was less than the quantity "represented" could only be made at the time of delivery. The statute's use of the past tense "represented" further bolsters its intent to criminalize a defendant's failure to deliver the quantity stated in the contract or otherwise promised.

*Torres v. State*, No. 04-12-00752-CR, 2013 WL 5942605, at *2 (Tex. App.—San Antonio Nov. 6, 2013, no pet.) (mem. op.). The evidence is therefore sufficient to support the jury's finding that Appellant intentionally or knowingly sold Serben less than the represented quantity of his construction services. We overrule Appellant's second issue.

## Conclusion

Having overruled Appellant's issues, we affirm the trial court's judgment.

/s/ Lee Gabriel
LEE GABRIEL
JUSTICE

PANEL: MCCOY, MEIER, AND GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 17, 2014