**AFFIRM; and Opinion Filed December 7, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-18-00177-CR
No. 05-18-00178-CR
No. 05-18-00179-CR
No. 05-18-00180-CR

**DARVIN DONTERRIUS STAPLES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause Nos. 219-80229-2016, 219-80230-2016, 219-80231-2016, 219-80232-2016**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Lang-Miers

In 2016, appellant was indicted in, and pled guilty to, four aggravated robberies. The trial

court deferred adjudication of appellant's guilt and placed him on community supervision for a

period of five years in each case.

In 2017, the State moved to adjudicate appellant's guilt in all four cases. The motion

alleged that appellant had committed new offenses of evading arrest/detention and resisting arrest,

had failed to pay and was delinquent in supervision fees, had failed to perform community service,

had failed to pay court costs, and had direct contact with a co-defendant.[1] In January of 2018, appellant pleaded "true" to the State's allegations without the benefit of a plea bargain agreement on punishment. After a hearing, the trial court found all the allegations to be true, granted the State's motion, adjudicated appellant's guilt, and sentenced him to fifteen years in prison in all four cases.[2]

## Appellant's Allegations and State's Response

On appeal, appellant claims that the trial court abused its discretion by failing to conduct a competency inquiry pursuant to the provisions of TEX. CODE CRIM. PROC. ANN. art. 46B.004(c). Appellant states that there were "sufficient suggestions that appellant might not be competent" throughout the proceedings, from the original plea through the motion to adjudicate hearing. Appellant asks this Court to reverse and remand to the trial court for a new hearing on the motion to adjudicate or, alternatively, for a hearing to assess his competency at the time of the hearing.

The State responds that the trial court did not abuse its discretion by concluding that an inquiry into appellant's competency was not warranted at the adjudication hearing. The State further responds, in the alternative, that the trial court conducted a sufficient informal inquiry into appellant's competency.

## Competency

The prosecution and conviction of a defendant while he is legally incompetent violates due process. *Turner v. State*, 422 S.W.3d 676, 688-89 (Tex. Crim. App. 2013); *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). No plea of guilty or plea of nolo contendere should be accepted by a trial court unless it appears that the defendant is mentally competent and his plea is free and voluntary. TEX. CODE CRIM. PROC. ANN. art. 26.13(b).

---

[1] The motion also alleged that appellant had committed the offense of unlawful possession of a firearm. The State abandoned this allegation prior to the hearing on the motion.

[2] The sentences in all four cases were ordered to run concurrently.

A defendant is presumed to be competent to stand trial and shall be found competent unless proved incompetent by a preponderance of the evidence. TEX. CODE CRIM. PROC. ANN. art. 46B.003(b). A defendant is incompetent if he does not have (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or (2) a rational as well as factual understanding of the proceedings against him. TEX. CODE CRIM. PROC. ANN. art. 46B.003(a). Either party may suggest by motion, or the trial court may suggest on its own motion, that a defendant is incompetent. TEX. CODE CRIM. PROC. ANN. art. 46B.004(a). The initial inquiry is informal and is required only if evidence suggesting incompetency comes to the trial court's attention. TEX. CODE CRIM. PROC. ANN. art. 46B.004(b), (c); *Jackson v. State*, 391 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.). A trial court's first-hand, factual assessment of a defendant's competency is entitled to great deference on appeal. *Ross v. State*, 133 S.W.3d 618, 627 (Tex. Crim. App. 2004).

### Standard of Review

We review a complaint that the trial court erred in not conducting an informal competency inquiry for an abuse of discretion. *Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999); *Jackson,* 391 S.W.3d at 141. In conducting our review, we do not substitute our judgment for that of the trial court, but rather determine whether the trial court's decision was arbitrary or unreasonable. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute on other grounds as recognized in Turner,* 422 S.W.3d at 692 n. 31.

### Evidence Fails to Suggest Incompetency

In order for an informal inquiry as to appellant's competency to be required, there must have been some evidence before the trial court that suggested incompetency.  But here, neither the prosecutor nor defense counsel suggested that appellant might be incompetent to enter his guilty

pleas, to be sentenced, or to be adjudicated guilty. And because the evidence does not suggest incompetency, we affirm.

***Original Hearing on Guilty Pleas***

Prior to accepting appellant's pleas, the trial court ascertained that appellant had signed "several papers" and that he understood what he was signing. Appellant did not have any questions about the papers he had signed, what had already happened in his cases, or what the trial court was doing at the time of the hearing. The trial court questioned appellant as to whether he understood the "piece of paper called certification of rights on appeal" and that, because he was entering a plea of guilty without a plea bargain agreement, he would have the right to appeal; appellant answered "Yes, Your Honor." In response to the trial court's questions, appellant was able to supply his date and place of birth. The trial court further explained that a different judge would be determining appellant's sentence; appellant indicated that he understood this. The trial court ascertained that no one had forced, threatened, or promised appellant anything in exchange for his guilty pleas and that appellant was pleading guilty "exactly as charged" because he committed the crimes as alleged in the indictments.

The trial court also questioned defense counsel. In response to the trial court's question, defense counsel stated that he felt appellant fully understood the papers he had signed. The trial court then asked defense counsel "And you feel he's fully competent to enter his plea?" Defense counsel replied "I do." It was only then that the trial court accepted appellant's guilty pleas.

***Sentencing Hearing on Original Pleas***

At the hearing to decide appellant's sentences, the defense introduced evidence that at the age of seven appellant was crossing the crosswalk at school when he was hit by a car. He suffered a "pretty severe brain injury." While he ultimately recovered, there were some problems that led to intellectual difficulties. Appellant was "slower to understand things" and he struggled in school.

His mother described him as a "sweet child" and a "scared child" with a slower maturity rate than his peers or his younger sibling. Appellant had been raised in a small community in Mississippi where there was a slower pace. Appellant had difficulty adjusting when he moved to Dallas. Appellant attended special education classes and graduated from high school, but it took him longer to do so.

Evidence was also introduced that appellant had a job at a Wendy's and was a good employee. He had purchased a vehicle and had a learner's permit but did not yet have a driver's license. Appellant's mother testified that appellant knew right from wrong. She also testified that appellant was not a violent person, did not pick fights, and had never hurt anyone. Appellant was, however, very easily influenced and had gone "down the wrong road and hung out with the wrong crowd."

From this evidence, the trial court judge stated that he was having difficulty seeing how appellant could have been manipulated into committing four robberies or not understand what he was doing. The following exchange between the trial court and appellant's mother illustrates the trial court's concerns:

> THE COURT: Ma'am,
>
> THE WITNESS: Yes, sir.
>
> THE COURT: I understand that you were describing your son as a person who could be easily persuaded, manipulated, into doing certain things; right?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: I'm having a hard time getting my hands around the idea that he could be persuaded to holding a gun on somebody, fake or otherwise . . . and taking money from them. I guess, on the one hand you're describing to me a person who despite his – whatever deficiencies he might have, was bright enough to hold down a job at Wendy's?
>
> THE WITNESS. Yes.
>
> THE COURT: And he's bright enough no (sic) get his driver's permit?

THE WITNESS: Yes.

THE COURT: Maybe later in life than many people do but he got it, right?

THE WITNESS: Yes.

THE COURT: So that in my brain seems like somebody who would know it's wrong to do what he did?

THE WITNESS: Right. Of course, I'm not saying that he don't know right from wrong because he does.

THE COURT: Okay.

THE WITNESS: Trust me, he was raised to know right from wrong, so he knows right from wrong. Like I said, I'm not excusing none of it.

THE COURT: Right.

THE WITNESS: Because I knew he – you know, they didn't hold a gun to his head to make him do it; so, of course.

THE COURT: Okay. Thank you, ma'am.

Appellant testified in his own behalf. He stated that he cried when his family left Mississippi for Dallas because there was a slower pace in Mississippi and it was easier for him to manage that environment. He struggled in school, though his special education classes were "kind of" easier. He was often picked on because he did not do well in school and did not always understand things. He started smoking marijuana when he got to Dallas and began hanging around with the wrong crowd of people who he thought were "cool" and were his friends. On the night of the robberies, he "went along" and was willing to cooperate with his friends.

Prior to imposing sentence, the trial court stated its understanding of appellant's intellectual issues as follows: "[W]hat I'm hearing is . . . he's just deficient enough not to have fully, perhaps, appreciated consequences of his decision; but he's not so deficient that he couldn't contribute if he was given a second chance. We're walking on a real thin line there." Defense counsel replied: "You're right, Your Honor."

–6–

The trial court then found that the evidence was sufficient to find appellant guilty in each robbery, but deferred a finding of guilt and placed appellant on community supervision for a period of five years. The Court also said as follows: "I'm going to require that you be subject to MHMR evaluation. It may not be exactly the appropriate evaluation, but I think it's the closest thing our system has to address any unique needs you might have so you can be successful on this deferred adjudication."

### *Hearing on the State's Motion to Adjudicate Guilt*

#### *Trial Court's Preliminary Questioning*

At the hearing on the State's motions to proceed with an adjudication of guilt in these four robberies, the trial court engaged in extensive questioning of appellant.

The trial court ascertained that appellant had been afforded an opportunity to review all of the allegations in the State's motions. Appellant understood that, if adjudicated guilty, the applicable sentencing range was from five to ninety-nine years in prison or life, and up to a $10,000 fine. Appellant also understood that the trial court could continue him on deferred adjudication community supervision or could amend the conditions of community supervision. Appellant understood that he had no agreement with the State in exchange for his pleas of true and that he would be asking the court to assess sentences in these cases based on additional evidence that was to be presented at the hearing. Appellant acknowledged his signature on the pleas of true. The trial court also ascertained that appellant had talked to his lawyer about each of the forms before he signed them and was satisfied with his attorney's advice. The trial court further ascertained that appellant understood that, by signing the forms and entering his pleas of true, the trial court had "all the evidence it needs" to find him guilty of the four robberies.

*Trial Court Questioning on Appellant's Competency*

The trial court specifically inquired into whether appellant had ever been found incompetent:

> THE COURT: Sir, have you ever been confined to a mental institution?
>
> APPELLANT: No, sir.
>
> THE COURT: Have you ever been found incompetent by any court?
>
> Has a judge ever said, you're not able to make decisions for yourself, we're going to have somebody appointed to make decisions for you?
>
> DEFENSE COUNSEL: I think the reason why he hesitates, Your Honor, if I may – just to refresh the Court's memory, these original four aggravated robberies were heard by the Court.
>
> This was the group of four gentlemen who – in one night they were several aggravated robberies. Darvin went open to the Court and to remind the Court when he was a young boy, had a traumatic brain injury when he was struck by a vehicle. He does have, as a result of that, significant cognitive issues.
>
> THE COURT: Has he ever been found incompetent by a court as a result of any of that or anything else?
>
> DEFENSE COUNSEL: No, sir. We provided evidence to the Court at the time of that, and that's why the Court – *not that he's incompetent*, but the issues, the lack of understanding, the –
>
> THE COURT: I appreciate the explanation, but has he ever been found incompetent?
>
> DEFENSE COUNSEL: Not officially, Your Honor, no.
>
> THE COURT: Okay.

*Appellant's Pleas of True*

The trial court questioned appellant as to whether his pleas of true were freely and voluntarily made and was assured that they were. The trial court also heard defense counsel's explanation: "He (appellant) knows and understands the State's petition to adjudicate. He knows

and understands the allegations contained within. He knows and understands his rights with regards to each and every allegation. At this time he wishes to waive those rights."

*Results of the MHMR Evaluation*

The trial court heard from appellant's probation officer concerning the mental health evaluation that had been ordered. The probation officer testified that the evaluation "stated that he did not meet the criteria for mental health services." The evaluation was the only thing that the probation officer had been made aware of regarding appellant's "cognition and mental maturity or acuity."

*Evidence of New Offenses*

Officer Jason Jares testified that on April 2, 2017, he responded to a call where Officer Taylor Rust had stopped a car with five occupants. Rust was talking to the driver. Jares saw Rust get appellant, who was the front passenger, out of the vehicle. As Rust was going to start to pat appellant down, the appellant took off running. Appellant ran across the road; Jares saw Rust take appellant "to the ground." While Jares was watching this happen, James Morris, one of the other passengers and a co-defendant in the four aggravated robberies with which appellant was charged, took off from the back-driver's side of the vehicle. When Jares chased after Morris, he found a firearm a few feet from where Morris was "straddled to the ground."

Rust testified that he received a call that twenty black males and females were inside a room at a local motel that was supposed to be unoccupied. When he arrived at that location, he found the people leaving and getting into a car. He followed the vehicle and pulled it over for failure to use a signal when turning and for having a non-operational license plate light. He could smell marijuana and received consent to search the vehicle from the driver. After talking with the driver, Rust had appellant, the front passenger, get out of the car. Appellant took off running. Right before Rust caught up to appellant and tackled him, he saw a pistol fall from appellant's waistband.

Rust and appellant struggled, with Rust punching appellant several times in the face. A third officer located the gun which had fallen from appellant's waistband within appellant's reach.

Appellant testified that he had gone to the motel with a friend but was leaving when Morris offered him a ride home. Appellant testified that he was scared when the car got pulled over because he was on probation and did not want to go back to jail. Appellant asked the driver if he had anything; the driver said there was a gun between the seats and he was not going to take responsibility for the gun. Appellant knew that he could not be "caught with this gun around me." After the driver was placed in handcuffs, appellant testified that he "was so scared and panicked, I just grabbed the gun and was trying to get rid of it." Appellant put the gun in his pants to try and hide it. He then panicked and ran, dropping the gun before trying to get rid of it. An officer jumped on him and hit him twelve times.

Appellant reiterated at this hearing that Dallas had been overwhelming to him. He did not have a gun on him when he went to the party at the motel. He also testified that he had no intention of shooting or otherwise harming the officer.

Appellant's uncle, Leroy Staples, Jr., testified that if the trial court were to continue appellant on probation he would take appellant under his direct supervision and have appellant work with him in his business. Staples was questioned about appellant's intellectual difficulties:

> DEFENSE COUNSEL: Are you aware of any – when we originally had the hearing in front of this Judge – in this Court with His Honor, do you recall that there were – there was a request to try to create a probation protocol that was kind of unique for Darvin's situation. He was kind of – he wasn't mentally ill, but he had some cognitive issues and he was kind of in this in between situation; correct?

> THE WITNESS: Yes.

> DEFENSE COUNSEL: He struggles with certain decisions, understanding consequences, and the severity of situations and that kind of thing, correct?

> THE WITNESS: Yes, sir.

*How Probation Dealt with Appellant's Intellectual Difficulties*

Defense counsel clarified through appellant how probation had evaluated him with regard to his intellectual difficulties:

> DEFENSE COUNSEL: Okay. Do you remember in our first hearing when you were sentenced that the Judge did his best to get creative and try to help probation to try to come up with a plan that dealt with the fact that you weren't – you're not – *you're not mentally ill, I mean you don't suffer from a mental illness, right*?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: But *you're above the threshold of incompetency,* so you're not handicapped in that regard. So the Judge had tried to get probation to order some things, hopefully get creative in – in your supervision to help you succeed given the cognitive issues that you deal with; you remember that?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: Other than the mental health evaluation – again this is not to blame anyone we're trying to make sure the Court has the full picture – other than the mental health evaluation, did you get any specific or any additional help with regard to the challenges that you face given the injury that you suffered when you were a child?
>
> APPELLANT: No, sir.
>
> DEFENSE COUNSEL: Okay. It was just a standard probation?
>
> APPELLANT: Yes, sir.

*Exchange between Defense Counsel and Trial Court*

At the conclusion of the hearing, the following exchange occurred between the trial court and defense counsel:

> DEFENSE COUNSEL: I would say to the Court – and again this isn't a blame thing, I think perhaps may be what we were equipped to handle given his unique situation, and I – I really don't think –
>
> THE COURT: It didn't sound like he needed any special guidance or counseling from his own testimony. When he was in the car and he was alerted to the police being behind him. It sounds like he was aware they were behind him before they ever put their lights on. So he's aware of his surroundings.
>
> DEFENSE COUNSEL: No, no, no, I don't mean –

–11–

THE COURT: And he knew that once they were behind him, Oh, my goodness, this is not good. So he knows good and bad.

DEFENSE COUNSEL: Yes, but I – I don't think it's that simple, Your Honor. I think – I think the Court can appreciate, it doesn't compute like it does for –

THE COURT: But it did compute for him. Those are his words.

DEFENSE COUNSEL: Well, it computed that he was scared. Obviously any contact with police – actually at that time –

THE COURT: He was scared because he knew he was on deferred and he knew there was a gun in the car, and he knew there was a person in the car that he was not supposed to be with because he was on deferred and he was not allowed to be around that person.

DEFENSE COUNSEL: I – the only –

THE COURT: He wasn't just scared because it was the police, he was scared because it was the police and, oh, my goodness, I'm doing all these things that if the police find out about, it will be bad for him.

DEFENSE COUNSEL: Yes and no. What I would argue to the Court is based on the – what I took from the testimony is that he sees the police, that's when he originally gets scared; and that's when he questions about what's in the car. He was scared just by their presence enough to say, hey, are you holding anything? And that's when the driver says, yeah, I've got a gun in the car. He says, well, are you going to take responsibility for that because I can't be around that. They guy says no. So he starts processing very differently than what we would. You and I, Your Honor –

THE COURT: That's when we punish behavior when they process it wrong at some point, right?

DEFENSE COUNSEL: Assuming that all else is equal, but the all else is not equal in this case as the Court is well aware.

\*

He did the mental health evaluation, but I think we all knew he didn't have – *he wasn't depressed. He wasn't bipolar. He wasn't schizophrenic*. That wasn't the issue, the issue is that as a child he had a traumatic brain injury which definitely affects the way he thinks.

\*

I think this is a very unusual situation because *if I had him evaluated for competency* or, you know, some sort of handicap that would put him below the threshold level, IQ level, *I think he would be above that but just barely.*

Defense counsel emphasized that he was not disagreeing with the facts, but arguing that prison was not the answer for appellant due to his intellectual difficulties.

*Analysis*

In order to necessitate an inquiry into appellant's competency, the trial court must have observed behavior, or heard evidence, that caused the court to question either appellant's ability to consult with his lawyer with a reasonable degree of rational understanding or appellant's rational and factual understanding of the proceedings against him.

The only evidence of any form of impairment before the trial court was that appellant had suffered a brain injury as a child that had resulted in some intellectual difficulties. This evidence, by itself, was insufficient to trigger an informal inquiry into appellant's competency. *See Turner*, 422 S.W.3d at 689–91 (holding that the fact that a defendant is mentally ill does not by itself mean he is incompetent); *Ayers v. State*, 01-14-00621-CR, 2016 WL 316490, at *4 (Tex. App.—Houston [1st Dist.] Jan. 26, 2016, no pet.) (mem. op. not designated for publication) (holding that, although there was evidence that the defendant had suffered a brain injury and was experiencing memory issues, the relevant inquiry was whether his mental instability was such that he lacked the capacity to understand the nature of, and object to, the proceedings against him, to consult with counsel, and to assist in preparing his defense). There must have been some evidence that appellant's intellectual difficulties operated in such a way as to "prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interests." *See Turner*, 422 S.W.3d at 691.

There was no evidence that appellant's intellectual difficulties impacted his participation in the proceedings. To the contrary, the evidence before the trial court was that appellant understood the allegations against him, was able to communicate with his attorney in a rational manner, and was making an informed decision to enter free and voluntary pleas of true. There was

–13–

no evidence that appellant was unable to communicate with his attorney, or to assist in his defense. Appellant answered all questions posed to him, either by the trial court, the prosecutor, or by defense counsel. His answers to these questions were cogent, thoughtful, respectful, and showed his active participation in his defense. Further, appellant's testimony, given in an effort to mitigate punishment, reflects that he understood his situation, especially the consequences of his being found with a gun while on community supervision. We conclude that the trial court did not err by not conducting an informal inquiry into appellant's competency to enter his pleas of true.

### Sufficient Informal Inquiry Made

Even if we were to find that the trial court should have engaged in an informal inquiry into appellant's competency, the evidence shows that such an inquiry was made.

An informal inquiry may be satisfied when the trial court poses questions to the defendant and/or defense counsel regarding a defendant's competency. *Luna v. State*, 268 S.W.3d 594, 598–600 (Tex. Crim. App. 2008); *Jackson*, 391 S.W.3d at 142.

At the hearing on the State's motion to proceed to an adjudication of guilt, the trial court extensively questioned appellant about his understanding of the proceedings. The trial court specifically asked both appellant and defense counsel whether appellant had ever been found incompetent and was assured that he had not. And defense counsel stated not only appellant's understanding of the proceedings but also that appellant was not incompetent. Additionally, the same trial court judge presided at the hearing to assess punishment on the original plea and also at the hearing on the motion to adjudicate guilt. The trial court judge had ample opportunity to observe appellant's conduct and demeanor throughout the proceedings

The trial court's questioning, both of appellant and of defense counsel, along with the trial court's own observations, constitutes an adequate informal inquiry into appellant's competency. *Jackson,* 391 S.W.3d at 142 (holding that the trial court's inquiry to defense counsel coupled with

–14–

its own observations of defendant constituted sufficient informal inquiry into defendant's competence). To the extent that an informal inquiry was required, if it was, the record shows that one was made.

## **Conclusion**

We overrule appellant's issue and affirm.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

180177F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DARVIN DONTERRIUS STAPLES,
Appellant

No. 05-18-00177-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 219-80229-2016.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of December, 2018.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DARVIN DONTERRIUS STAPLES,
Appellant

No. 05-18-00178-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 219-80230-2016.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 7th day of December, 2018.



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

DARVIN DONTERRIUS STAPLES, Appellant

No. 05-18-00179-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-80231-2016.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of December, 2018.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DARVIN DONTERRIUS STAPLES,
Appellant

No. 05-18-00180-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 219-80232-2016.
Opinion delivered by Justice Lang-Miers.
Justices Bridges and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of December, 2018.