**Opinion issued July 9, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00144-CR**

———————————

**JEREMY DWAYNE PLEASANT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1754667**

**MEMORANDUM OPINION**

Following a bench trial, the trial court found appellant Jeremy Dwayne

Pleasant guilty of the third-degree felony offense of repeated violation of a protective

order.[1] Pleasant pleaded "true" to the allegations in an enhancement paragraph, and the trial court assessed his punishment at ten years' confinement. In his sole issue on appeal, Pleasant argues that the trial court erred by not *sua sponte* conducting an informal inquiry into his competency to stand trial.

We affirm.

## Background

The complainant S.E. ("Sarah")[2] first met Pleasant, who was a friend of her older brother, while she was growing up in Houston. Sarah was around twelve when she met Pleasant, who was in his early twenties. After Sarah's brother moved out of state, she and Pleasant grew closer. Eventually, when Sarah was fifteen, her friendship with Pleasant turned sexual. Pleasant was around twenty-one or twenty-two at the time.

Many years later, Sarah saw Pleasant again. She testified that there was "something different" about him, and it "seemed like there was something mentally off." Pleasant behaved erratically, stopping during conversation with Sarah to "talk

---

[1]    *See* TEX. PENAL CODE §§ 25.07(a) (prohibiting certain actions in violation of protective order), 25.072(a) (providing that person commits offense of repeated violation of protective order if, during period that is 12 months or less in duration, person engages two or more times in conduct that constitutes offense under section 25.07).

[2]    In this opinion, we refer to the complainant by a pseudonym to protect her privacy.

2

to someone who wasn't there" and expressing religious delusions. However, Sarah did not believe that Pleasant had any difficulties understanding what she said to him.

Pleasant's unpredictable behavior frightened Sarah, and she stopped communicating with him. In response, Pleasant "started getting aggressive about communicating" with Sarah. He would hide in bushes around Sarah's neighborhood and show up unannounced at her workplace. On one occasion, he stood outside the windows of Sarah's workplace with what looked like a weapon and called Sarah "hundreds and hundreds and hundreds of times" until she called the police. On a different night, Pleasant walked into Sarah's home and stood in her foyer, staring at her, until she turned around and noticed him. Sarah moved several times, and Pleasant discovered her new address each time.

Pleasant also harassed Sarah over social media, sending her unsolicited messages and posting about her on multiple Facebook pages. He posted personal information about Sarah and her family members, including her address, and the make, model, and VIN number of her car. He also left her threatening voicemails.

In August 2021, while Sarah was visiting her family, Pleasant repeatedly called her and left a voicemail stating that he was at her home address. Sarah let one of her friends answer her phone, which "enraged" Pleasant. Pleasant threatened to kill both Sarah and her friend. At first, Sarah believed that Pleasant was "being delusional," but he also "notated some actual locations," which alarmed her and her

3

family. Sarah called the police. She and her family members drove to her house to see if Pleasant was there, and they discovered him "in the middle of the highway walking back and forth talking to himself." Sarah hid, but she saw Pleasant walk directly to her house, open her car door, and try to get into her house. Police officers arrested Pleasant, and he was charged with stalking Sarah.

While Pleasant was incarcerated in the Harris County Jail on the stalking charge, Sarah obtained a lifetime protective order against him. Among other things, the protective order prohibited Pleasant from "[c]ommunicating with [Sarah] in any manner except through his/her attorney of record or a person appointed by the Court[.]" A deputy with the Harris County Constable's Office served Pleasant with the protective order at the Harris County Jail.

Despite the protective order, Pleasant continued trying to communicate with Sarah while he was incarcerated. Pleasant made multiple calls to Sarah from the Harris County Jail during the first few months of 2022, and he also sent her a letter. A criminal complaint for violation of the protective order was filed on January 13, 2022.

On March 4, 2022, while Pleasant was in custody and awaiting trial on the stalking offense, his appointed counsel moved for a psychiatric examination to determine his competency to stand trial. Counsel stated the following rationale for requesting the examination: "Defendant is suffering under grandiose and

contradictory delusions that he is law enforcement, working for celebrities, etc. [S]peech is tangential and requires frequent redirection." The trial court granted the motion and ordered Harris County Forensic Psychiatric Services to conduct a psychiatric examination of Pleasant. Later in March 2022, a Harris County grand jury indicted Pleasant for the offense underlying this appeal: repeated violation of a protective order. This offense was assigned to the same trial court in which the stalking offense was pending.

Dr. Aaron Boyce, a psychologist, examined Pleasant and, on March 31, 2022, filed a report documenting his conclusions concerning Pleasant's competency. Dr. Boyce interviewed Pleasant, reviewed his medical records and criminal history, and reviewed a prior competency evaluation that had been performed by another psychologist in November 2021. Although Dr. Boyce acknowledged that Pleasant's "presentation indicates unspecified schizophrenia spectrum and other psychotic disorder and unspecified personality disorder with antisocial features," as well as a history of substance abuse and "non-adherence to treatment," Dr. Boyce opined that Pleasant was competent to stand trial. Pleasant's mental health issues were discussed during trial, but the question of his competency was not raised following this second competency evaluation.

Following a consultation with his counsel, Pleasant waived his right to a jury trial and opted for a bench trial. After hearing testimony from Sarah, the deputy who

served Pleasant with the protective order paperwork, and an investigator responsible for handling information requests relating to the Harris County Jail's phone system, the trial court found Pleasant guilty of the offense of repeated violation of a protective order.

During the punishment phase, Sarah testified that Pleasant used someone else's cell phone to call her two days before trial. Pleasant accused Sarah of stealing from him and said that he had a protective order against her, "but the Court got the paperwork mixed up and that's why it looks like [she has] a Protective Order against him." The trial court admitted a recording of this conversation.

Pleasant testified on his own behalf during the punishment phase. He characterized Sarah as "kind of like a girlfriend, player, partner, and a wife." He wanted Sarah to give him credit for a nonprofit organization that she had started to help young women and girls in the Houston area. Pleasant testified that he is a rapper and a music producer who has worked with "Def Jam and [the] Destiny's Child girls." He stated that he has met several famous rappers, musicians, and athletes, and he "wanted [Sarah] to be a part of it" with him. He testified that he "was diagnosed [with] psychotic schizophrenia in 2008 after receiving a lightning bolt to [his] forehead." He was inconsistent about whether he took his prescribed medication.

Pleasant pleaded true to the allegations in an enhancement paragraph. The trial court assessed his punishment at ten years' confinement. This appeal followed.

**Competency to Stand Trial**

In his sole issue on appeal, Pleasant argues that the trial court abused its discretion by not *sua sponte* conducting an informal inquiry into his competency.

## A.      *Standard of Review and Governing Law*

As a matter of due process, a criminal defendant who is incompetent may not stand trial. *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018); *Turner v. State*, 422 S.W.3d 676, 688 (Tex. Crim. App. 2013). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." *Turner*, 422 S.W.3d at 688–89 (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). The "constitutional standard" for competency asks whether the defendant has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* at 689.

To ensure that "legally incompetent criminal defendants" do not stand trial, the Texas Legislature has enacted "a substantive and procedural framework for making competency determinations." *Boyett*, 545 S.W.3d at 563; *Turner*, 422 S.W.3d at 689. The Legislature has adopted the constitutional standard for competency, providing that:

> (a) A person is incompetent to stand trial if the person does not have:
>
> > (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or
> >
> > (2) a rational as well as factual understanding of the proceedings against the person.

TEX. CODE CRIM. PROC. art. 46B.003(a). A defendant is presumed competent, and he "shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." *Id.* art. 46B.003(b); *Ex parte LaHood*, 401 S.W.3d 45, 54 (Tex. Crim. App. 2013).

The Legislature has also set out a procedure for raising issues of incompetency. Either party may suggest by motion that the defendant may be incompetent to stand trial, and the trial court may also make such a suggestion on its own motion. TEX. CODE CRIM. PROC. art. 46B.004(a); *Clark v. State*, 592 S.W.3d 919, 925 (Tex. App.—Texarkana 2019, pet. ref'd) (stating that article 46B "places certain responsibilities on the trial court to inquire into the matter independently and force the parties to litigate the issue, if necessary"). If evidence suggesting the defendant may be incompetent comes to the trial court's attention, the court "on its own motion shall suggest that the defendant may be incompetent to stand trial." TEX. CODE CRIM. PROC. art. 46B.004(b).

An informal inquiry into competency is called for "upon a 'suggestion' from any credible source that the defendant may be incompetent." *Boyett*, 545 S.W.3d at

8

563; *see* TEX. CODE CRIM. PROC. art. 46B.004(c), (c-1); *Turner*, 422 S.W.3d at 691–92 ("[A]ny suggestion of incompetency to stand trial calls for an informal inquiry to determine whether evidence exists to justify a formal competency trial.") (quotations omitted). Code of Criminal Procedure article 46B.004(c-1) provides:

> A further evidentiary showing is not required to initiate the [informal] inquiry, and the court is not required to have a bona fide doubt about the competency of the defendant. Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that the defendant is incompetent within the meaning of Article 46B.003.

TEX. CODE CRIM. PROC. art. 46B.004(c-1); *Clark*, 592 S.W.3d at 925 ("The amount of information necessary to trigger an 'informal inquiry' is low."). Where a suggestion of incompetency has been made but the court has not formally adjudicated the issue, "due process requires the trial court to remain ever vigilant for changes in circumstances that would make a formal adjudication appropriate." *Turner*, 422 S.W.3d at 693.

Article 46B.024 lists several non-exclusive factors that an expert conducting a competency examination shall consider:

(1) the capacity of the defendant during the criminal proceedings to:

   (A) rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings;

   (B) disclose to counsel pertinent facts, events, and states of mind;

9

(C)  engage in a reasoned choice of legal strategies and options;

(D)  understand the adversarial nature of criminal proceedings;

(E)  exhibit appropriate courtroom behavior; and

(F)  testify;

(2)  as supported by current indications and the defendant's personal history, whether the defendant:

(A)  is a person with mental illness; or

(B)  is a person with an intellectual disability;

(3)  whether the identified condition has lasted or is expected to last continuously for at least one year;

(4)  the degree of impairment resulting from the mental illness or intellectual disability, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner; and

(5)  if the defendant is taking psychoactive or other medication:

(A)  whether the medication is necessary to maintain the defendant's competency; and

(B)  the effect, if any, of the medication on the defendant's appearance, demeanor, or ability to participate in the proceedings.

TEX. CODE CRIM. PROC. art. 46B.024; *LaHood*, 401 S.W.3d at 53 (stating that factors experts use in conducting competency evaluations "are also helpful to the fact-finder in determining the broader question of competency").

The Legislature "apparently regards a defendant's capacity to rationally assist in the preparation and execution of his defense to be indispensable to a defendant's competency to stand trial." *Turner*, 422 S.W.3d at 689. The considerations for

competency evaluations set out in article 46B.024 "contemplate a defendant who is at least minimally able to interact with his trial counsel in a 'reasonable and rational' way (even if they do not necessarily agree) in formulating decisions how most effectively to pursue his defense." *Id.* at 689–90. The defendant "retains ultimate authority" over certain trial-related decisions, such as whether to testify in his defense. *Id.* at 691. It is therefore "critical" that the defendant be able to "consult with counsel with a reasonable degree of rational understanding about" these decisions. *Id.* (quotations omitted). The relevant time frame for determining competency is at the time of the proceedings. *Laflash v. State*, 614 S.W.3d 427, 432 (Tex. App.—Houston [1st Dist.] 2020, order).

We review a trial court's decision whether to conduct, *sua sponte*, an informal inquiry into a defendant's competency for an abuse of discretion. *See id.*; *Lindsey v. State*, 544 S.W.3d 14, 21 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). Under this standard, we will not substitute our judgment for that of the trial court. *Laflash*, 614 S.W.3d at 432–33. Instead, we determine whether the trial court's decision was arbitrary or unreasonable. *Id.*

## B. Whether the Trial Court Should Have Conducted an Informal Inquiry into Pleasant's Competency

Pleasant argues that the trial court had before it "a plethora of evidence" suggesting that he was incompetent to stand trial, and therefore the court erred by failing to conduct an informal inquiry into Pleasant's competency. Pleasant points

11

out that he had two prior competency evaluations, which should have alerted the court that his mental condition was a concern to his attorneys and that the court needed to "remain ever vigilant" as to possible changes in competency. *See Turner*, 422 S.W.3d at 693. He further points to a recording of a phone conversation that he had with Sarah two days before trial and his own "bizarre and delusional" testimony at the punishment phase as evidence that suggests incompetency.

Sarah had known Pleasant when she was a young teenager, but she did not have contact with him for a "very long time." When she saw Pleasant again years later, "[t]here was something different about him" and "[i]t seemed like there was something mentally off." Pleasant behaved erratically, talking to people who were not present and trying to "convince [Sarah] that he was Jesus." Although Pleasant "seemed like kind of schizophrenic a little bit," Sarah believed that he understood what she was telling him. However, Pleasant's behavior frightened Sarah, and she attempted to cut off communication with him.

Sarah had a series of increasingly unwanted and aggressive interactions with Pleasant, including numerous threatening voicemails that Pleasant left for her. For example, in a message left on July 13, 2021, Pleasant denied harassing Sarah and accused her of having her friends follow him and of trying to find out where he lived. He also referred to Sarah as his girlfriend and claimed that popstar Beyonce was his cousin. In other messages, Pleasant referred to an alias that he used for making

music, discussed an invention that he was working on, and made additional statements indicating that he believed he was in a relationship with Sarah. Pleasant also made demands for money from Sarah and made threats of violence.

In August 2021, Pleasant left a voicemail that alarmed Sarah because he mentioned her address. In a second message, he threatened to kill Sarah and one of her friends. At first, Sarah believed Pleasant was "just being delusional." She testified that he was "always saying something that I don't understand, that doesn't make sense, but he notated some actual locations and so that caused my family alarm and fear because he threatened to kill us; he's coming down here to kill us." Sarah and her family drove towards her house and saw Pleasant "in the middle of the highway walking back and forth talking to himself." Following this incident, police officers arrested Pleasant for stalking Sarah.

While Pleasant was incarcerated on the pending stalking charge in late 2021 and early 2022, he was twice evaluated for his competency to stand trial. The first competency evaluation occurred in November 2021. The report from this evaluation is not included in the appellate record, but it is undisputed that the examiner found Pleasant competent to stand trial.

Several months after the first competency evaluation, Pleasant's counsel for the stalking charge moved for a second competency evaluation. Counsel requested the examination for the following reasons: "Defendant is suffering under grandiose

and contradictory delusions that he is law enforcement, working for celebrities, etc. [S]peech is tangential and requires frequent redirection." The trial court granted the motion, and Dr. Boyce evaluated Pleasant in late March 2022, days after Pleasant was indicted for the underlying offense.

Dr. Boyce reviewed the allegations made by Sarah, Pleasant's criminal history, medical records made during Pleasant's incarceration at the Harris County Jail, and medical records from prior to Pleasant's incarceration. Pleasant's medical records included diagnoses for schizoaffective disorder, bipolar type; sedative abuse; opioid abuse; hallucinogen abuse; cocaine abuse; alcohol abuse; unspecified psychosis; and cannabis dependence. Pleasant had been prescribed psychoactive medication in the past, although records indicated "a history of non-adherence to medication." The Harris County Jail records reflected that Pleasant had "exhibited paranoia and grandiose delusions" during his incarceration, including delusions related to celebrities, religious delusions, and delusions concerning being struck by lightning. Around the time of the competency evaluation, Pleasant's mental health concerns were "unremarkable," and he showed "no acute distress."

During Dr. Boyce's interview of Pleasant, Pleasant was "oriented to person, place, time, and location"; he was polite and able to control his behavior; and his speech was "fluent and intelligible, and he could engage in reciprocal conversation without issue." Pleasant's thought processes "were mostly logical and sequential,"

14

and he could "tell a story within a consistent timeline." Although his conversation was "tangential at times," Dr. Boyce could easily redirect him, and Pleasant "participated fully in the interview." Pleasant reported experiencing auditory and visual hallucinations, including religious hallucinations. He also "exhibited grandiose delusional thought content at times," such as by stating that "he could speak with animals, was a trained firefighter, owned multiple businesses, and that he received special powers after being struck by lightning."

However, despite Pleasant's report of hallucinations, Pleasant "could reason rationally and logically about his legal options in this case," and his delusional thoughts did not impair his ability to communicate with Dr. Boyce or "have a reasonable discussion about the allegations or court proceedings." Pleasant did not show overt signs of hallucinations, and he displayed "appropriate" eye contact, attention, concentration, and motor activity. Dr. Boyce had no concerns about Pleasant's ability to comprehend information, and his "recent and remote memory capacity were intact."

Dr. Boyce specifically addressed the competency factors set out in article 46B.024. *See* TEX. CODE CRIM. PROC. art. 46B.024. Pleasant "rationally [understood] the charges against him and the potential consequences of the pending criminal proceedings." For example, he was able to differentiate between misdemeanors and felonies; he understood different plea and punishment options;

he could explain probation; and he understood the roles of trial participants, rights such as the right to remain silent and the right to an attorney, potential evidence, and the bail system. He was able to disclose "pertinent facts, events, and states of mind," providing an account of his arrest that was consistent with the offense report, discussing his state of mind at the time, recalling his most recent conversation with his attorney, and accurately stating his next court date.

Dr. Boyce opined that although Pleasant "does exhibit a mental illness and/or defect that has lasted or is expected to last continuously for at least one year," he also exhibits "rational and logical thought processes with the capacity to engage with counsel reasonably and rationally." Dr. Boyce believed that the psychoactive medication prescribed to Pleasant "may be necessary to maintain his competency to stand trial." Ultimately, Dr. Boyce concluded that Pleasant "has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." Dr. Boyce thus opined that Pleasant was competent to stand trial.

Ten months later, in January 2023, the underlying trial began. At the time the proceeding started, Pleasant had not decided whether he wanted to have a jury trial or a bench trial. The trial court asked if Pleasant wanted the court to explain both options, and when Pleasant responded "yes," the trial court did so. Pleasant did not have any questions following the court's explanation, but when asked if he had

reached a decision, he stated, "I really don't know until I speak with my counsel." The record reflects that the trial court gave Pleasant the opportunity to discuss the matter with his counsel. Following a recess, Pleasant agreed on the record that he wanted to have a bench trial. Pleasant had no questions when informed that he needed to sign a written waiver of his right to a jury trial.

During the guilt-innocence phase of trial, defense counsel brought up the fact that Pleasant had mental health issues. For example, Sarah testified on cross-examination that while she did not know whether Pleasant had ever been hospitalized or whether he had a formal diagnosis, she had seen him talking to himself and behaving erratically. During closing argument, defense counsel repeatedly referenced Pleasant's mental health, arguing that the court should dismiss the charges or order probation so Pleasant "can get the mental help he needs." Defense counsel did not argue that Pleasant was not competent to stand trial.

During the punishment phase, Sarah testified that Pleasant called her, apparently from someone else's cell phone, two days before trial. Pleasant "was talking about how [Sarah] stole from him" and "about how he had a Protective Order against [Sarah] but the Court got the paperwork mixed up and that's why it looks like [Sarah has] a Protective Order against him." The trial court admitted a recording of this phone call. In this recording, Pleasant stated that Sarah was the one who kept contacting him and he has a protective order against her, he talked about Sarah's

name, he stated that Sarah owed him money, he mentioned a perjury charge, he discussed his grandmother's house and an occasion when Sarah ate a sandwich at his house, and he mentioned his music alias.

Pleasant testified on his own behalf during the punishment phase. He "kinda" understood what a protective order was, stating that he "tried to get one, so [he] believe[s] it's to protect you from harm." He did not believe that Sarah would have harmed him, nor did he believe that he was going to harm her. He testified that, instead, he would harm someone who was trying to hurt her.

When asked what his relationship was to Sarah, he stated, "She was kind of like a girlfriend, player, partner, and a wife." Pleasant wanted credit for a nonprofit organization with which Sarah was involved and for her to remember "that [he] gave it to her." Pleasant correctly stated that the nonprofit involved helping young women achieve their goals, but in describing how the business got started, Pleasant referenced his mother and a sister, "an Indian code," the Beaumont Police Department, a fire department that his family owned, an ex-boyfriend of Sarah's "that she almost married but she never married," Pleasant's need for "somebody to run a business," and an offer for Sarah to have the nonprofit "if she wanted some candy."

Defense counsel questioned Pleasant about what he has "waiting for [him] when [he] get[s] out," and asked, "What are the career opportunities you told me

about?" Pleasant responded that he was "still working with Def Jam and [the] Destiny's Child girls." Pleasant makes and produces "righteous music" in a genre that he calls "hip rock," or "hip hop and rock in the name of Jesus Christ." He has a fanbase that includes the actor Will Smith, his "real godfather." When asked who else he knows, Pleasant stated that he has met several famous rappers, musicians, and athletes. He "wanted [Sarah] to be a part of it, so [he] was trying to surprise her that many years and [he] just didn't give up and she took it the wrong way."

Pleasant testified that he "was diagnosed [with] psychotic schizophrenia in 2008 after receiving a lightning bolt to [his] forehead." Defense counsel asked whether Pleasant feels like he needs medication, and Pleasant replied, "[N]ow I do think I always need something. I just didn't know what it was." He later testified that he took Abilify and Benadryl, two medications that he "couldn't really afford" when he was not incarcerated. He identified Abilify as "something for mood swings."

On cross-examination, Pleasant agreed that his competency had been evaluated, but he disagreed that he had had two evaluations. With respect to taking his prescribed medication, he stated that "they didn't really make a medication for me yet." He denied abusing drugs, although he acknowledged that he has tried marijuana, synthetic marijuana, and alcohol.

Pleasant again mentioned that he had been struck by lightning, and when the prosecutor told him that neither of the psychologists who had evaluated his

19

competency were able to corroborate that, he stated, "Unless they go to Terrell State Hospital." He testified that he had been hospitalized for two weeks after the lightning strike, and he had numerous tests performed on him. He agreed that he had filed documents with the court during the pendency of the case. At the close of testimony, Pleasant pleaded true to the allegations in the enhancement paragraph contained in the indictment.

The State argues that while Pleasant may have made statements during trial that were "potentially bizarre or delusional," none of the evidence implicates the statutory elements of incompetency: whether Pleasant does not have a "sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding" or a "rational as well as factual understanding of the proceedings against" him. *See* TEX. CODE CRIM. PROC. art. 46B.003(a). As a result, the trial court did not abuse its discretion by failing to conduct an informal inquiry into Pleasant's competency. We agree with the State.

The Court of Criminal Appeals has recognized that a defendant's statements "which suggest some irrationality" do not necessarily show that the defendant is unable to rationally consult with counsel or understand the proceedings against him. *See Ross v. State*, 133 S.W.3d 618, 627 (Tex. Crim. App. 2004) (evaluating, under prior statutory scheme for competency, whether defendant presented evidence that raised *bona fide* doubt regarding his competency to stand trial); *Johnson v. State*,

20

429 S.W.3d 13, 18 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("Bizarre, obscene, or disruptive comments by a defendant during court proceedings do not necessarily constitute evidence supporting a finding of incompetency."); *see also Clark*, 592 S.W.3d at 928 (concluding that trial court did not abuse its discretion by finding defendant competent even though defendant had mental illness and failed to cooperate with counsel because defendant's mental illness "does not by itself mean he is incompetent").

As the Court of Criminal Appeals stated in *Turner*:

The fact that a defendant is mentally ill does not by itself mean he is incompetent. Nor does the simple fact that he obstinately refuses to cooperate with his trial counsel. Indeed, even a mentally ill defendant who resists cooperating with his counsel may nevertheless be found competent if the manifestations of his particular mental illness are not shown to be the engine of his obstinacy. But when a defendant's mental illness operates in such a way as to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interests, he cannot be made to stand trial consistent with due process. Evidence that raises this possibility necessitates an informal inquiry, and if that inquiry reveals that the possibility is substantial, a formal competency trial is required.

422 S.W.3d at 691; *see Boyett*, 545 S.W.3d at 564 ("[T]here must be some evidence indicating that the defendant's refusal to rationally engage with counsel is caused by his mental illness.").

Although the record contains substantial evidence that Pleasant had a history of mental health concerns, there is no evidence that Pleasant's mental health status affected his ability to consult with his counsel "with a reasonable degree of rational

21

understanding." In connection with another charge before the grand jury indicted Pleasant for the underlying offense, the trial court appointed an expert to evaluate Pleasant's competency. That expert ultimately concluded that Pleasant was competent to stand trial.

Ten months later, at the trial for the underlying offense, Pleasant's second appointed counsel candidly addressed Pleasant's mental health concerns but did not raise the issue of competency. Defense counsel gave no indication that he had difficulty consulting with Pleasant while preparing the case for trial, that Pleasant had been unable to assist him, or that he believed Pleasant did not have a rational or factual understanding of the proceedings. *Contra Turner*, 422 S.W.3d at 694 (considering evidence of defendant's repeated disagreements with appointed counsel, counsel's statement that defendant "seems to have one train of thought and he disregards all other rational thoughts completely," counsel's representations that defendant's paranoia led him to believe his attorneys were conspiring with prosecutors to secure conviction, and defendant's refusal to communicate with his counsel during voir dire as evidence supporting finding that defendant lacked capacity to rationally engage with counsel).

Furthermore, although Pleasant made statements during the phone call to Sarah two days before trial and during his testimony that were obviously factually incorrect, these statements are not evidence that Pleasant lacked a rational and

factual understanding of the proceedings against him. At times Pleasant's answers to questions by his counsel and the State were rambling, tangential, and delusional, but he was able to answer the questions asked of him. He understood what a protective order was. He denied wanting to harm Sarah, but he also acknowledged that he "just didn't give up" in wanting her to be a part of his life and success, and "she took it the wrong way." He had plans for when he was released from incarceration. He related information about his family, his substance abuse history, his mental health history, and his adherence to medication.

Additionally, Pleasant's statements during his trial testimony were consistent with statements contained in his records from the Harris County Jail that were referenced in Dr. Boyce's report and statements made to Dr. Boyce during their interview. Pleasant's jail records included statements that he "was married to famous singers and that he was targeted by individuals regarding the current charge." He also told jail staff that he had been struck by lightning and he was "receiving messages from God through his cellular phone." During his interview with Dr. Boyce, Pleasant mentioned having religious hallucinations, and he stated that he "could speak with animals, was a trained firefighter, owned multiple businesses, and that he received special powers after being struck by lightning."

Nevertheless, Dr. Boyce opined that Pleasant's delusional thoughts did not affect his ability to engage with counsel and understand the proceedings against him,

23

and therefore Pleasant was competent to stand trial. The fact that Pleasant made similar statements to these during his trial testimony is not evidence of a change in circumstances that would suggest incompetency. *See Laflash*, 614 S.W.3d at 432 ("The relevant time frame for determining a person's competence is at the time of the proceedings.").

We conclude that although the record contains evidence that Pleasant had mental health concerns and had been prescribed at least one psychoactive medication at the time of trial, the record contains no evidence that Pleasant's mental health issues prevented him from having (1) a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or (2) a rational as well as factual understanding of the proceedings against him. *See* TEX. CODE CRIM. PROC. art. 46B.003(a); *Turner*, 422 S.W.3d at 691 ("The fact that a defendant is mentally ill does not by itself mean he is incompetent."). We therefore hold that the trial court, which was in the position to view Pleasant's demeanor during trial, did not abuse its discretion by not *sua sponte* conducting an informal inquiry into Pleasant's competency to stand trial. *See McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003) (concluding that trial court did not err by failing to hold formal competency inquiry and stating that it "cannot ignore the trial court's first-hand factual assessment of [the defendant's] mental competency" and that trial court's factual findings "are entitled to great deference").

We overrule Pleasant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).